JUDGE MARRERO

# 25 CV 06010

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN WEIS Derivatively on Behalf of NEW FORTRESS ENERGY, INC., <br><br> Plaintiff, <br><br> WESLEY R. EDENS, CHRISTOPHER S. GUINTA, RANDAL A. NARDONE, DESMOND IAIN CATTERALL, DAVID J. GRAIN, C. WILLIAM GRIFFIN, TIMOTHY W. JAY, KATHERINE E. WANNER, JOHN J. MACK, and MATTHEW WILKINSON, <br><br> Defendants, <br><br> and <br><br> NEW FORTRESS ENERGY, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff John Weis ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of New Fortress Energy, Inc. ("New Fortress" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, documents obtained by Plaintiff pursuant to 8 *Del. C.* § 220, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

2.      This action involves misrepresentations about a floating liquefied natural gas facility set to operate off the coast of Altamira, Tamaulipas, Mexico, in the Gulf of Mexico (the "Altamira FLNG Project").

3.      The Individual Defendants (defined below) told investors that the FLNG facility would be completed in March 2023 despite known impediments.  They also told investors that once up and running, the Altamira FLNG Project would propel the Company's earnings from breakeven to "$2.5 billion plus." Neither of these things happened. Instead, as the risks the Individual Defendants knew but concealed all along materialized, the Individual Defendants repeatedly pushed back timelines and lowered earnings guidance. New Fortress did not even manage to produce LNG at the Altamira FLNG Project until nearly a year and a half after it told investors operations would commence.

4.      The Altamira FLNG Project commenced with fanfare. The Individual Defendants announced their plans for the FLNG facility in July 2022.  The unit consisted of an LNG compression unit that was to float offshore, supported by three repurposed (previously used) jack-up rigs.  The unit was to undergo a substantial amount of construction onshore in Corpus Christi, Texas. Once fully constructed, tested, and ready for operation, the Individual Defendants intended to deploy the FLNG unit to the Company's offshore site off the coast of Altamira.  From there, the rigs were to be assembled and begin production. In November 2022, Defendants (defined below)

held an FLNG Investor Day at the Corpus Christi, Texas, construction site. Analysts who reported on the event told investors that they left the day "with increased confidence in [New Fortress'] ability to deploy its FLNG units on time" and that "much of the execution risk, for this highly ambitious gambit, has been removed."

5.      With analyst and investor interest piqued, New Fortress' stock price hit a near all-time high trading at approximately $60 per share. The Individual Defendants used this moment to announce an extraordinary corporate maneuver several weeks later in December 2022—an "Update" to the "Dividend Policy" whereby shareholders would receive a $3.00/share dividend twice a year in addition to the quarterly $0.10/share dividend routinely paid. According to the Individual Defendants, the Altamira FLNG Project and the revenue it would generate was the driving force behind this monumental change in New Fortress' dividend policy. In truth, the Altamira FLNG Project did not fund the dividend. Instead, New Fortress financed the dividend by drawing $700 million from its credit facility.

6.      Defendant Wesley R. Edens, the Company's Founder, Chairman, and Chief Executive Officer, controlled New Fortress at this point vis-à-vis his ownership of over 72.6 million shares of stock. On his authority, New Fortress paid the $3.00/share dividend resulting in Edens receiving a cash payment of approximately $217 million. The $3.00/share dividend was never paid again.

7.      Construction at the Altamira FLNG Project was never as the Individual Defendants described it to investors. Delays were endemic resulting from a "chaotic" work environment, understaffing, and incorrect sequencing of construction, all of which was known to the Individual Defendants who paid close attention to the FLNG Project and were provided with real-time updates concerning its progress before they made false statements to investors. The Individual

3

Defendants concealed these significant impediments and falsely assured investors that construction was going as planned, and that New Fortress' earnings guidance remained within reach.

8.     To mask the extent of their delays, the Individual Defendants chose to deploy the FLNG unit from the Corpus Christi construction site to its offshore location in Altamira knowing that construction was still incomplete, commissioning had barely even started, and there were dramatically fewer workers to complete the project offshore. As time progressed, the Individual Defendants were forced to repeatedly admit that they could not meet promised timelines or earnings guidance. Analysts and investors lost all interest and trust in the Individual Defendants by the time the Company finally announced that production had commenced at the Altamira FLNG Project. As a result of the Individual Defendants' misrepresentations and the materialization of the risks they concealed, New Fortress' stock price plummeted to under $15 per share from a high of near $60.

## JURISDICTION

9.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the

4

exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; (iii) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District; and (iv) Defendants have otherwise purposefully availed themselves of this District through being listed on the NASDAQ in this District and issuing false statements in this District.

12.    In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

### Plaintiff

13.    *Plaintiff John Weis* is, and was at all relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

14.    *Nominal Defendant New Fortress* is a Delaware corporation with its principal executive offices located at 111 W. 19th Street, 8th Floor, New York, NY 10011. The Company's

common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "NFE."

**Director Defendants**

15. *Defendant Wesley R. Edens* ("Edens") is the Company's Founder, Chairman, and Chief Executive Officer ("CEO").

16. *Defendant Randal A. Nardone* ("Nardone") has served as a Company director since August 2018.

17. *Defendant Desmond Iain Catterall* ("Catterall") has served as a Company director since January 2019.

18. *Defendant David J. Grain* ("Grain") has served as a Company director since January 2019.

19. *Defendant C. William Griffin* ("Griffin") has served as a Company director since January 2019.

20. *Defendant Timothy W. Jay* ("Jay") has served as a Company director since March 2023.

21. *Defendant Katherine E. Wanner* ("Wanner") has served as a Company director since January 2019.

22. *Defendant John J. Mack* ("Mack") served as a Company director from January 2019 through to April 2025.

23. *Defendant Matthew Wilkinson* ("Wilkinson") served as a Company director from January 2019 through to May 2023.

24. The above-named defendants are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

25.    ***Defendant Christopher S. Guinta*** ("Guinta") was, at all relevant times, Chief Financial Officer.

26.    Defendants Edens and Guinta are collectively referred to herein as the "Officer Defendants."

27.    The Director Defendants along with the Officer Defendants are collectively referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

28.    New Fortress is an American liquefied natural gas ("LNG") company. The Company owns and operates natural gas and LNG infrastructure and an integrated fleet of ships and other logistics assets to deliver energy solutions to customers worldwide.

29.    Liquefied natural gas, otherwise known as LNG, is essentially a highly compressed form of natural gas that can be readily shipped and then converted back to gas when needed at its ultimate destination.  The process requires liquefication facilities that cool the gas and reduce its volume.  LNG is easier to store and transport over long distances via specialized tankers, particularly to areas not accessible by natural gas pipelines.

30.    New Fortress initially started trading as a publicly held company on the NASDAQ stock exchange in February 2019 under the name New Fortress Energy LLC.  In August 2020, it converted from a Delaware limited liability company to a Delaware corporation and changed its name to New Fortress Energy Inc.

31.    Defendant Edens has controlled New Fortress since its founding.  As explained in the Company's prospectus for the initial public offering ("IPO"), Defendant Edens and co-founder

Defendant Nardone owned approximately 90% of New Fortress following the offering. Their collective ownership interest decreased following the IPO as the Company raised equity financing and issued additional shares into the market. As of December 31, 2022, Defendants Edens and Nardone owned and/or controlled approximately 42% of New Fortress' voting power.

32.    At all relevant times, New Fortress conceded it was a "controlled company" within the meaning of the NASDAQ's rules. Defendants Edens and Nardone, together with affiliates of Energy Transition Holdings LLC, held a majority of the voting power and had the right to nominate a majority of the members of New Fortress' board of directors (the "Board"). Energy Transition Holdings LLC was subject to a shareholder agreement effectively giving Defendants Edens and Nardone control over its shares (which at all relevant times amounted to approximately 12% to 15% of New Fortress' voting interest).

**Altamira FLNG Project**

33.    The Altamira FLNG Project (also referred to as FLNG 1) was the first of five FLNG units that, according to Defendant Edens, would propel New Fortress' EBITDA from breakeven to "$2.5 billion plus" in the span of just a few years.

34.    New Fortress first announced the project in a press release dated July 5, 2022. Defendant Edens then discussed it during an investor update call held later the same day. In pertinent part, Defendant Edens described the project as follows:

> So it's in the Gulf of Mexico. There's a city called Altamira. It's notable from our standpoint, is that a pipeline, a large pipeline runs from Texas subsea to Altamira before it makes kind of a right-hand turn and goes onshore. What we have agreed to do with the CFE [Mexican Comisión Federal de Electricidad] as our partner again is basically build an LNG offshore hub. So I think our initial plan would be to put 2 liquefiers in place there. The CFE would be -- have profits interest in them. So we'll provide the capital but they will basically provide the gas that they'll purchase in -- on our behalf and provide transportation.
>
> They own the firm transport on that pipeline, so they'll basically be -- they're

8

experts in terms of both buying gas and transport. They'll be providing that. That's the partnership. We will then take that gas. It will be obviously already treated gases coming out of the great state of Texas for the most part. So it's in perfect shape to then be processed, turned into LNG that is available for export or potentially they can use it within Mexico, because there's needs for gas in different regions of Mexico. So -- and to see if they'll be our partner there.

35.    Defendant Edens put the Altamira FLNG Project in context by explaining that it provided New Fortress with a "path[] to market for our FLNG products, and that's significant." Analysts focused on it as the most important of three transactions identified by Defendant Edens and emphasized its potential to generate earnings.  For instance, on July 6, 2022, Evercore issued a report titled *Pushing a Heavy Stack of Chips on FLNG*.  Evercore stated:

New Partnership with Comisión Federal de Electricidad (CFE) NFE will sell CFE the La Paz Power Plant and to create a new FLNG hub off the coast of Altamira, Tamaulipas Mexico for LNG. CFE will source the gas via import pipelines running through Brownsville, Texas piping cross border U.S. supplied gas. NFE will deploy multiple FLNG units of 1.4 MTPA each that utilize CFE's existing firm pipeline transportation capacity to deliver feed gas volumes to NFE.

36.    Analysts celebrated the Altamira FLNG Project as additional details emerged over the next several months.  For instance, on August 9, 2022, Evercore raised its price target from $58 per share to $73 per share in a report titled *The Winds of Commodity Fortune Blowing in NFE's Direction*.  In pertinent part, Evercore attributed its price increase in part to a "faster implied growth rate" from additional FLNG opportunities, including the Altamira FLNG Project.  Also, on August 12, 2022, JMP Securities increased its price target from $56 per share to $70 per share, noting the Company's "meaningful initiatives underway" including the Altamira FLNG Project.

37.    On September 9, 2022, the Company (through an indirect subsidiary) filed its application with the U.S. Department of Energy for authorization to (i) export domestically produced natural gas to the Altamira FLNG Project; and (ii) re-export liquefied natural gas from the Altamira FLNG Project to foreign countries (both Free Trade Agreement countries and Non-

9

Free Trade Agreement countries). In the application, the Company requested authorization "by February 2023 so that it may commence exports immediately following completion of construction and in-service of the Project, which is anticipated to occur in the first quarter of 2023." However, while it indicated in this filing a need for operating authorization by February 2023, it had no reasonable basis to believe that it would complete construction and in-service in the first quarter of 2023, and did not disclose to investors known impediments hindering such completion.

38.     Instead of disclosing the obstacles they faced in terms of completing the Altamira FLNG Project, the Individual Defendants made materially false statements that misrepresented the status of the FLNG unit and concealed known risks jeopardizing the timeliness of the project and, in turn, the Company's ability to generate revenue from it.

39.     The Individual Defendants' false statements began on September 20, 2022, when New Fortress announced plans to host an "FLNG Investor Day" at the Kiewit shipyard in Corpus Christi, Texas, on November 2, 2022, and quoted Defendant Edens stating that:

> We expect to achieve mechanical completion of our first FLNG unit in March 2023 and deploy FLNG 1 into operation by mid-year, with additional units to follow soon thereafter. Utilizing a highly skilled workforce on the U.S. Gulf Coast, we have developed an efficient and repeatable construction process – essentially an FLNG factory – that substantially reduces the cost and time to build incremental liquefaction capacity to meet the urgent needs of the global energy markets.

40.     The Individual Defendants' misrepresentations about the Altamira FLNG Project increased in scope and breadth when, for instance, on November 2, 2022, they used their false statements about the FLNG unit to increase New Fortress' earnings target for 2023 from $1 billion to "$2.5 billion plus" in a press release titled *NFE Increases 2022 and 2023 Earnings Goals, Hosts FLNG Investor Day at Shipyard in Texas*. Analysts applauded the Company's announcement. For instance, on November 3, 2022, Evercore reported that the Company had:

> [I]ncreas[ed] guidance for longer-term illustrative potential EBITDA generation to

10

$2.5 billion (from $1.5 billion). Though the bulk of the related financial updates are expected when NFE reports 3Q22 earnings on Tuesday, November 8. FLNG has been the major upside catalyst for this stock and our main takeaway from the tour is much of the execution risk, for this highly ambitious gambit, has been removed and the upside case for NFE is coming more clearly into focus.

41.      Evercore emphasized the Company's position in the market, stating "We urge investors (who may have been waiting on the sidelines before) to take a serious look at NFE now because FLNG, we believe, is coming soon and the broader market doesn't likely fully appreciate the potential upside to NFE. The time to invest is before NFE re-values higher post-completion on FLNG 1."

42.      On November 3, 2022, Jefferies issued a report titled *Fast LNG Investor Day Takeaways; PT to $75 from $65*. In part, Jefferies told investors that they "left Wednesday's Fast LNG investor day and site visit with increased confidence in NFE's ability to deploy its FLNG units on time. The company raised 2023 EBITDA guidance by $1bn primarily based on FLNG1 coming online mid-year. Our tour of the construction site demonstrated the progress thus far. Execution on timing continues to be paramount, but NFE appears on pace to capture the hefty price Fast LNG can offer."

43.      On November 8, 2022, following the Company's 3Q22 earnings report, Evercore again emphasized the potential benefits of the Altamira FLNG Project. In a report titled *Just Over the Horizon: An FLNG Rises from the Mexican Gulf*, Evercore wrote that "We continue to favor NFE's strategy of vertical integration into FLNG development, with multiple potential projects in the U.S. Gulf Coast.... NFE is uniquely positioned to build LNG export assets, with relatively unlimited commitments for near-term spot gas production, offering high near-term margin potential."

44.      New Fortress' FLNG Investor Day on November 2, 2022, impressed analysts and

11

investors. As Jefferies reported on November 3, 2022, the presentation left them with "increased confidence" in NFE's ability to "deploy its FLNG units on time." The hype around the Altamira FLNG Project pushed New Fortress' stock price to new highs, reaching nearly $60/share just days later.

45.    Unbeknownst to the public however, the Altamira FLNG Project was falling into chaos. Poor planning and inefficient execution were steadily pushing the March 2023 completion date outside the realm of possibility, creating an acute and tangible risk that the Altamira FLNG Project would not be completed on time leaving the Company with no realistic way to realize its EBITDA targets.

46.    According to FE7[1] (Commissioning and Start-Up / Simultaneous Operations Lead from March 2021 until February 2023), managing the Altamira FLNG Project was "chaos" throughout his time on the project. The timeline for completing the project was extremely ambitious. Management had set a "vicious schedule," creating a potential for safety hazards. By the time FE7 left the project in February 2023 (the month by which the Company's application sought authorization to begin operations), very little commissioning work had been done. The majority of the commissioning work was either incomplete or still in its earliest stages, yet the FLNG unit was transitioned offshore.

47.    FE3 (a contractor and pipefitter from June 2022 until November 2023) provided a similar account, describing the construction of the FLNG unit as rushed and chaotic. Workers were put under intense pressure to meet deadlines, whether or not the work was actually completed. According to FE3, this resulted in incomplete work being pushed forward with the goal of getting

---

[1]    References to "FE __" or Former Employees are taken from the Securities Class Action (defined below) and are based upon information and belief.

it (the unit) out as fast as possible, even though it was not ready.

48.    FE3 also described sequencing problems created by simultaneous construction and commissioning work. Commissioning activities typically occur after construction is complete. However, the Company had workers commissioning the FLNG unit at the same time it was being built. FE3 said the sequencing was completely unorganized and led to delays.

49.    Consistent with FE3's account, industry experts confirm that commissioning of an LNG plant is a process that is supposed to occur "*after* the completion of construction" so that the completed construction can be tested and optimized prior to operation. *See, e.g.*, Martello Expert Services, "Commissioning Clauses in LNG Contracts," available at: https://www.martelloglobal.com/commissioning-clauses-in-lng-contracts/. That is necessary because the whole point of commissioning is to verify the integrity of the constructed facility: "During this time- and labor-intensive process, engineers, field technicians, and operations personnel will comb through every inch of the facility, checking thousands of connections, instruments, valves, and equipment." *See* Matrix PDM Engineering "Startup and Commissioning Your Natural Gas Processing Facility," available at: https://www.matrixpdm.com/start-up-andcommissioning-your-natural-gas-processing-facility.

50.    FE1 (FLNG Startup Manager from January 2023 to November 2023 and LNG Compression Commissioning Lead from November 2022 to December 2022) explained that the Company failed to adhere to proper construction timelines and testing protocols. This included commissioning the FLNG unit before it had even finished being built. FE1 said the Company was trying to execute commissioning while still building it, which is not how construction and commissioning should occur.

51.    FE1 explained further that commissioning is the process of verifying and testing

all systems and equipment on the FLNG unit to ensure it operates as designed. This process involves steps such as running the refrigeration systems, pressure testing pipelines, and conducting trial runs. The Company chose not to complete certain tests before shipping the unit offshore because the construction work was taking too long. For instance, although the Company was supposed to conduct a "nitrogen run" test onshore before the FLNG unit was shipped, after delays in preparing for the test, the Company decided to abandon it before shipping the unit offshore. A "nitrogen run" test was a central feature of the commissioning process for the FLNG unit. The test involves circulating nitrogen gas through the unit's pipelines and equipment to simulate operating conditions. The test is supposed to ensure that all systems are leak-free and functioning as intended before operating the unit with natural gas.

52.    Poor planning and oversight of the project gave rise to serious concerns about the safety risks on site, according to FE1. The Company placed pressure on deadlines instead of the well-being of its workers. The lack of proper tracking during construction exacerbated the problems.

53.    FE10 (Completions Handover Contractor from September 2022 until December 2023) described additional delays created by the Company's decision to use repurposed jack-up rigs for the FLNG project. According to FE10, the used rigs were old and many of their key components, such as piping systems, were in poor condition. As a result, the Company had to replace more components on the rigs than it had planned for. According to FE10, the construction of these rigs was incomplete when shipped offshore and it was "well-known" that the construction was behind schedule while they were still onshore.

54.    FE10 also attributed the delay to the setting of knowingly unrealistic deadlines. According to FE10, the project timeline was constantly shifting without any clear plan as to how

14

everything would be completed. Information about the status of construction was discussed during weekly meetings led by Kenneth Withers, who oversaw completions tracking for Kiewit Corporation. The status of construction discussed at these meetings conflicted with the deadlines being given to the public by the Company.

55.     FE12 (Commissioning and Startup Manager from June 2022 to February 2023 and Vice President of Commissioning and Startup from February 2023 to December 2024) confirmed that the FLNG Investor Day on November 2, 2022 was staged to create an illusion of progress. According to FE12, the Company, pulled the main turbines from the manufacturer's (Siemens) factory early—three months before they were done—just to make it look like Defendants were further along to attendees at the investor day presentation, which included analysts that would report to investors on the progress of the Altamira FLNG Project. To accomplish this, New Fortress brought the turbines to the Kiewit construction site in Corpus Christi from the Siemens Factory to make it appear as if the turbines were finished being constructed. In fact, the Company had made a deal with Siemens to finish the construction of the turbines at the Kiewit yard, explained FE12. FE12 said that one of the Company's project engineers, Garrett Lam, led attendees at the investor day through the worksite and presented an exaggerated version of the status of the Altamira FLNG Project when, in truth, the progress presented was not real.

56.     A clear contradiction existed between, for instance, Defendant Edens' description of the FLNG unit's construction to investors and what actually was occurring on the ground at the construction site for the Altamira FLNG Project in Corpus Christi, Texas. To investors, Defendant Edens touted that the Company had "developed an efficient and repeatable construction process – essentially an FLNG factory." Meanwhile, according to the Company's frontline workers, the project had already descended into chaos and was constructed in a manner that risked a

catastrophic safety disaster.

57.     Investors remained in the dark and received no notification about the Altamira FLNG Project's true status of construction or timeline for completion. According to FE11 (Vice President at New Fortress from June 2021 until June 2024), the Company's financial models were heavily dependent on the timely completion of the Altamira FLNG Project. As a result, when it admitted a delay it would also have to lower revenue targets.

58.     This occurred, for instance, on February 28, 2023, when the Company had to lower its full year guidance from $2.5 billion to $2 billion because the Altamira FLNG Project's mechanical completion date shifted from March 2023 to May 2023. Even then, the Company did not reveal the truth about the construction problems it had already experienced and was continuing to experience for the Altamira FLNG Project. In fact, despite the delayed completion date, the Company still told investors that production would begin in July 2023. Neither the completion date nor the production date had any reasonable basis and could not be met given what was transpiring on the ground at the construction site.

59.     Instead of admitting the problems known to exist with the construction, the Company began shipping the unfinished FLNG unit (which comprised three rigs referred to as Pioneer 1, 2 and 3) offshore in July 2023. Multiple witnesses confirm that the unit was incomplete at the time it was shipped offshore.

60.     FE12 (Commissioning and Startup Manager from June 2022 to February 2023 and Vice President of Commissioning and Startup from February 2023 to December 2024) explained that the decision to send the FLNG unit and rigs offshore before construction was complete was primarily due to escalating costs at the Kiewit construction site in Corpus Christi, Texas, where subcontractor inefficiencies made work timelines unpredictable. FE12 described the Kiewit

construction site as a "mess" and confirmed that the "schedule kept slipping" as costs continued to "skyrocket[]." According to FE12, Defendant Edens decided to send the FLNG unit and rigs offshore before they were finished being constructed.

61.    FE10 (Completions Handover Contractor from September 2022 until December 2023) confirmed that the FLNG unit was in an "incomplete state" when it was sent offshore. The electrical systems were not ready, the potable water systems were not finished, and the hydrotesting was incomplete.

62.    According to FE10, everyone working on the rigs knew they were incomplete when they were shipped offshore. FE10 utilized a project tracking system named MC Plus to track the progress of installations on the FLNG unit. For instance, MC Plus tracked the status of equipment installations, hydro-testing on piping systems, and mechanical completion of various subsystems. The tracking status was also discussed during the weekly tracking meetings led by Kenneth Withers, who oversaw completions tracking at Kiewit Corporation. The MC Plus system and weekly meetings frequently highlighted how much work remained to be done, especially for systems that were deferred to offshore completion.

63.    FE1 (FLNG Startup Manager from January 2023 to November 2023 and LNG Compression Commissioning Lead from November 2022 to December 2022) identified a critical test that was incomplete at the time of shipping the unit offshore. This test was the "nitrogen run" test, which is intended to test the unit for safe operation when natural gas is introduced into it. While New Fortress intended to conduct this test onshore, delays led the Company to abandon the plan and ship the unit offshore before the test was completed. According to FE1, the Company shipped the unit offshore before conducting the test because conducting the test would have caused the Company to miss the target completion date it had provided to the public.

17

64.     FE1 also confirmed that each rig comprising the FLNG unit was shipped offshore before it was complete, and before the unit had completed the "nitrogen run" test that initial plans called for completing onshore. Based on the status of construction, the rigs were in no condition to be offshore, according to FE1. The rigs were still under construction at the time they were shipped offshore. This decision worsened already significant construction delays and commissioning delays. Offshore workforces were limited to about 300 workers compared to onshore workforces totaling approximately 3,000 workers. By shipping the rigs offshore while still under construction, the Company subjected the FLNG unit to constraints caused by limited workforces available to complete construction and commissioning while offshore.

65.     Delays were exacerbated further by the Company's decision to terminate Fluor Corporation just as it was preparing to ship the FLNG unit offshore. According to FE1, Fluor Corporation was the engineering, procurement, and construction contractor for the Altamira FLNG Project. The Company decided to terminate Fluor Corporation in mid-2023. This caused the project to lose expert commissioning workers at a critical point in the project. The Company was unable to replace the engineers it lost after terminating Fluor Corporation, according to FE1.

66.     FE3 (contractor and pipefitter from June 2022 until November 2023) provided another example of the unit being incomplete when shipped offshore. Just before being shipped offshore, a critical malfunction occurred with the gear system on one of the jack-up rigs. One of the gears that controls the rig's ability to increase and decrease its height broke during testing. According to FE3, the rig needed to be 100% operational before being shipped offshore.

67.     In addition to the jack malfunction, FE3 explained that much of the piping work was incomplete when the FLNG unit was shipped. There were still significant cleanouts and connections left unfinished, particularly in the vessel areas at the bottom of the rig. The process

18

was "a mess," according to FE3. Workers were struggling to distinguish between materials meant for demolition and those intended for use.

68.    FE3 stated that the construction and commissioning work was "completely unorganized" and that the unit was still under construction at the time of shipping offshore. Some of the construction was delayed as a result of known material shortages. For instance, construction was delayed for several months throughout the summer of 2023 while New Fortress waited for the delivery of 1,000-pound valves needed for the unit's operation that it had not already procured. According to FE3, the lack of planning and sequencing causing these delays was not typical of other projects he had worked on while at Kiewit Corporation.

69.    FE9 (Commissioning and Startup Engineer from July 2022 until June 2023) stated that key aspects of the FLNG unit were still incomplete as of June 2023, particularly the marine scope. According to FE9, the marine scope was "a mess." The marine scope is crucial rig infrastructure that keeps the FLNG unit afloat and prevents it from sinking.

70.    FE9 stated that the marine scope was far from being finished as of June 2023. Adding to the problems was that the FLNG unit rigs were repurposed and, because regulations change frequently, the rigs were not up to date. These issues were directly communicated to FE12, who was the Vice President of Commissioning and Startup for the Altamira FLNG Project, during daily (or bi-daily) meetings at the Corpus Christi construction site. During the meetings, FE9's manager, Breffni Allen, would directly inform FE12 that the unit was not ready for offshore deployment.

71.    FE8 (Telecommunications Lead from November 2023 until February 2024) confirmed that critical safety and compliance systems, such as public announcement systems, general alarm systems, and navigation radars, were not working upon FE8's arrival at the Altamira

19

FLNG Project in November 2023. At that time, FE8 observed that the project was "chaotic" and poorly managed. Many components of the unit were half-finished or entirely absent. FE8 surveyed the unit during his first week and discovered crates of uninstalled equipment scattered across the deck. FE8 said the FLNG unit was shipped offshore prematurely with key systems incomplete, which added to the complexity and cost of the project because labor offshore is triple or quadruple the price of labor onshore.

72.     The insurance consortium backing the FLNG unit discovered certain critical systems were not working and, consequently, sent a team of inspectors to examine the project from Lloyd's Register Group Limited. The inspectors were tasked with ensuring the FLNG unit met the minimum safety standards required for maritime classification and insurance coverage. The inspectors confirmed that the FLNG unit's systems were noncompliant upon inspection. The insurance consortium sent an official warning letter to Andrew Couch, the Managing Director of the FLNG unit construction. According to FE8, this letter was sent shortly after the FLNG rigs were shipped offshore. The letter gave New Fortress one month to resolve the non-compliance issues or risk losing insurance coverage for the unit. FE8 spent the majority of his time on the Altamira FLNG Project addressing the deficiencies identified by the inspection team.

73.     FE8's previous experience includes work on other deepwater platforms. The FLNG unit for the Altamira FLNG Project was "insane" given that it was not fully constructed in November 2023 before being shipped offshore. According to FE8, the project also suffered from severe staffing shortages, particularly in critical areas like operational technology and distributed control systems. These staffing shortages created delays in calibrating and integrating control systems with physical equipment.

74.     FE8 doubted the timelines the Company was giving the public. In fact, it was

20

openly discussed during meetings that completion of the "monitoring points" was not feasible in line with the timetables set by New Fortress. FE12 (Vice President of Commissioning and Startup) attended these meetings and noted that they were "doing 250 monitoring points per day" with "80,000 to go." FE8 said that even by February 2024, the liquefaction plant had significant piping and system integration work remaining, making it impossible for the Company to "hit first LNG by April [2024]."

75.    The Company did not disclose the unfinished and incomplete status of the FLNG unit before being shipped offshore, or the obstacles and delays that prevented the FLNG unit from being completed once the Altamira FLNG Unit project was at sea. Instead, during quarterly earnings reports and various press releases, the Company quietly pushed back its timelines for completion and production.

76.    The Individual Defendants continued to misrepresent the status of the Altamira FLNG Project and conceal the risks that existed with respect to its timely completion and the Company's ability to generate revenue. For instance, on February 29, 2024, while reporting its fourth quarter and end of year earnings for 2023 (*i.e.*, 4Q23), the Company told investors that it was now expecting production to commence in March 2024 instead of September 2023 and sales in April 2024 instead of October 2023. During the quarterly conference call, Defendant Edens downplayed the situation at the Altamira FLNG Project by stating that completion had only "been a little bit delayed."

77.    Similarly, on May 8, 2024, while reporting its quarterly results for the first quarter of 2024, the Company extended these deadlines to May 2024 and June 2024, respectively for production and sales. Then, on July 23, 2024, in a press release announcing closing on new financing, the Company noted in passing that it had completed liquefaction days earlier and was

21

now expecting sales to commence in August 2024.

78.    The Company's updates to investors, set forth below, masked the true state of affairs at the Altamira FLNG Project and effectively prevented investors from evaluating the true risks associated with investing. Indeed, FE11 (Vice President at New Fortress from June 2021 until June 2024) delayed securing service and repair contracts at the direction of senior management. Securing service and repair contracts for the FLNG unit was a complex process because they had to be in place for several months before commercial operations began. However, FE11 said that the delays in getting the FLNG unit operational kept preventing the service contracts from being executed. By January 2024, Defendant Guinta instructed FE11 to delay service contracts due to uncertainty over when operations would begin. Even in June 2024, FE11 was still under orders not to execute service and repair contracts because management did not know when the FLNG unit would be operational.

79.    FE12 (Commissioning and Startup Manager from June 2022 to February 2023 and Vice President of Commissioning and Startup from February 2023 to December 2024) confirmed that by December 2023, it was known that the Altamira FLNG Project would not be commissioned by March 2024. By the end of February 2024, construction on the FLNG unit was far from complete despite the Company's executives publicly claiming otherwise. FE12 confirmed that a significant number of punch list items remained outstanding at that time, particularly those classified as "Priority A," which meant they were essential for commissioning and startup.

80.    According to FE12, the Company had "hundreds of Priority A punch list items still open," as of February 2024. These items comprised work that had to be done before New Fortress could "even think about startup." FE12 indicated that Fluor's records would contain the open (incomplete) items. Even in late March 2024, FE12 said that major installation work

22

remained ongoing, including structural steel, insulation, and painting. Construction was ongoing during commissioning, including welding and painting.

81. FE6 (Marine Operations Manager from April 2024 to August 2024 and in a similar capacity as a contractor starting in January 2024) described how the delay of completion prior to the onset of winter exposed the construction to further storm delays between January and March 2024. FE6 was responsible for ensuring that materials and workers reached the FLNG unit at sea but on at least five occasions, weather disruptions prevented this from happening. When severe weather occurs, the port is closed by authorities and supply chains must be interrupted, FE6 explained. The height of the waves and wind speeds needed to return to acceptable levels before shipping and transportation could resume.

82. FE2 (Gas Treatment Operator from January 2024 to December 2024) arrived onsite at the Altamira FLNG Project in January 2024. At that moment, FE2 said it was clear the project was far from being completed, despite Defendants telling investors otherwise. FE2 was shocked at the condition of the equipment while touring the FLNG unit. For example, the mixed refrigerant system was not even bolted down and piping was just hanging from various places. Additionally, key components such as the mixed refrigerant compressor, which is essential for liquefying natural gas, were not commissioned when FE2 arrived. The mixed refrigerant compressor was not commissioned until May 2024 and was not fully operational until August 2024. Likewise, the firewater system had not been installed and the rig's primary power source, the turbine generators, was not operational. The rig was operating off emergency generators because the main generators were not operational until late-March 2024 or early-April 2024. The LNG Boil-Off Gas Compressor and Hot Oil System were also not fully installed, tested, or mechanically complete when FE2 first arrived at the FLNG unit, both of which are critical for

23

producing LNG. The Hot Oil System presented repeated problems as well. A faulty pump malfunctioned on four separate occasions, necessitating repairs that delayed commissioning. According to FE2, almost nothing had been commissioned when FE2 arrived in February 2024.

83.    While FE2 was touring the rig in February 2024, FE2 asked when the Company expected first production of liquefied natural gas. FE2 was told that the Company was projecting it for April 2024. FE2 responded that the deadline was inaccurate by several months given that commissioning was supposed to be occurring in February yet construction crews were still installing pipes. FE2 had a similar conversation in January 2024 with the Company's Operations and Maintenance Training Manager, Johnie Boutwell, who said that commissioning would not be completed on schedule because the FLNG unit was in the midst of a "turnaround." A "turnaround" refers to a process where all the equipment on a unit is shut down to address multiple maintenance issues.

84.    According to FE2, in February 2024, the Altamira FLNG Project was still in the pre-commissioning phases and installing equipment that was not yet installed. By March 2024, the acid gas removal unit was still unfinished. The Company was still installing pumps with miscellaneous piping laying out on the deck. On April 26, 2024, an explosion occurred damaging a key component in the LNG refrigeration process. Specifically, one of the cold boxes used to cool and liquefy natural gas exploded during a pressure test. The cold box's internal aluminum piping burst and threw small particles of perlite insulation all over the FLNG unit platform. The explosion ruptured internal piping. Repairs lasted about a month. The following picture shows the cold box's paneling ruptured as a result of the explosion:

24



85.    The explosion delayed construction and forced management to reassess its timelines and start focusing on one task at a time.  FE2 said that significant work still remained to be completed at the time of the explosion.  For instance, the mixed refrigerant compressor, the boil-off gas compressor, and the heavy hydrocarbon removal unit still needed to be commissioned.

86.    In light of the work needed for these projects alone, the Company was in no way capable of producing liquefied natural gas within 72 hours, as Defendant Guinta stated during the Company's quarterly conference call on May 8, 2024. In fact, commissioning of the heavy hydrocarbon removal unit did not occur until late-July 2024; on July 9, 2024, the "scrubs column bottom pump" was still leaking during a leak check, which is an early step in the commissioning process.  The following picture shows the leak that occurred during testing on July 9, 2024:



87.    FE2 attributed many of the delays to the Company's decision to skip critical pre-commissioning steps onshore and ship the FLNG unit offshore prematurely.  According to FE2, approximately 85% of the project's delays were due to issues that would have been resolved during a proper onshore pre-commissioning phase.  For instance, during a test involving a valve on the pre-treatment side of the unit, workers discovered that a radio battery had been lodged inside of it.  Other tests and inspections revealed rocks, caution tape, and other debris inside pipes and strainers during commissioning.  This debris would have been properly cleared during onshore pre-commissioning if the process had not been skipped.  Nitrogen testing, for instance, would have cleared the debris before going offshore, according to FE2.

88.    FE2 also observed understaffing at the Altamira FLNG Project, which contributed to the "chaos."  FE12, Vice President of Commissioning and Startup for the Altamira FLNG

Project, routinely worked double shifts without days off. According to FE2, FE12 worked from 8:00 a.m. to midnight in order to cover both day and night shifts. FE2 said this led to disorganization. As FE12 became more overworked, he stopped conducting important meetings, such as the 30-minute daily update meetings and "Permit to Work" meetings, which informed employees about approved permits. Further, because FE12 was constantly on-site, he would routinely have his contractors move from project to project without finishing anything properly. For instance, FE12 would have contractors start on one project, such as the commissioning of the regen gas compressor. But, before they could halfway complete the task, FE12 would move them onto an entirely different project. The project also suffered from a lack of full-time engineers on site. After the cold box explosion, Chart Industries deployed a team who stayed on the rig until October 2024. Honeywell also sent an engineer to oversee the acid gas removal unit testing. Aside from those instances, FE2 explained that a lack of consistent engineering support added to the chaos on the project.

89.    The understaffing at the project was exacerbated by extremely poor living conditions on the rigs. According to FE2, the living conditions were worse than any conditions previously experienced by FE2, which included working in around 50 facilities throughout the Gulf of Mexico. One of the most significant issues was mold in the living quarters. Management did not address the mold issue until August or September 2024. Overcrowding made conditions worse. The rigs were designed to house approximately 120 people, but 300 or more were present, with some housed in "float tails" and "lift boats." During work shifts, the extreme number of people on the FLNG unit often resulted in "chaos," according to FE2.

**FALSE AND MISLEADING STATEMENTS**

90.    On September 20, 2022, the Company issued a press release titled *NFE Schedules*

27

*FLNG Investor Day in Texas.* The press release stated:

> NEW YORK--(BUSINESS WIRE) -- Sep. 20, 2022 -- New Fortress Energy Inc. (NASDAQ: NFE) ("NFE" or the "Company") announced today that the Company plans to host an FLNG Investor Day at the Kiewit Offshore Services ("KOS") shipyard near Corpus Christi, Texas, on Wednesday, November 2nd, 2022, beginning at 10:00 A.M. Central Time. Specializing in the fabrication and integration of offshore projects, the 555-acre KOS facility is home to NFE's Fast LNG program and the ongoing conversion of marine infrastructure into floating liquefaction units.
>
> "With our partners at Kiewit, we look forward to hosting investors and analysts at this world-class facility in Texas," said Wes Edens, Chairman and Chief Executive Officer of NFE. "We expect to achieve mechanical completion of our first FLNG unit in March 2023 and deploy FLNG 1 into operation by mid-year, with additional units to follow soon thereafter. Utilizing a highly skilled workforce on the U.S. Gulf Coast, we have developed an efficient and repeatable construction process – essentially an FLNG factory – that substantially reduces the cost and time to build incremental liquefaction capacity to meet the urgent needs of the global energy markets."

91.      The above-referenced statements were materially false and/or misleading when made because: (a) the Individual Defendants did not expect, and had no reasonable basis to expect, to achieve "mechanical completion" in March 2023 or "deploy FLNG 1 into operation" by mid-year 2023; (b) the Company had not then "developed an efficient and repeatable construction process" for LNG facilities; and (c) the statements omitted the following known material non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (2) as confirmed by former employees (including FE1, FE3, FE7, and FE10), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (3) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (4) by failing to take standard safety measures and pressuring

28

employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

92.    The true state of affairs at the Corpus Christi construction site for the Altamira FLNG Project was an environment of "chaos," according to former employees. The Company had not "developed an efficient and repeatable construction process – essentially an FLNG factory," as stated above, but instead created a workplace suffering from misdirection and inefficiency that gave rise to serious safety risks, according to former employees.

93.    On October 28, 2022, the Company issued a press release titled *NFE Finalizes Agreements with CFE in Mexico, Including Plans for Offshore FLNG Hub Near Altamira*. The press release stated:

> NEW YORK--(BUSINESS WIRE) -- Oct. 28, 2022 -- New Fortress Energy Inc. (NASDAQ: NFE) ("NFE" or the "Company") announced today that it has finalized its agreements with Comisión Federal de Electricidad ("CFE") as part of a growing strategic alliance supported by His Excellency Andrés Manuel López Obrador, the President of Mexico, and by Manuel Bartlett, the CEO of CFE.
>
> ***
>
> NFE and CFE are collaborating on the creation of a new FLNG hub off the coast of Altamira, Tamaulipas.
>
> Pursuant to the now finalized agreements, NFE will deploy multiple FLNG units of 1.4 MTPA each that utilize CFE's existing firm pipeline transportation capacity on TC Energy's Sur de Texas-Tuxpan Pipeline to deliver feedgas volumes to NFE.
>
> NFE's first FLNG unit, which is under construction at the Kiewit Offshore Services shipyard near Corpus Christi, Texas, is currently expected to achieve mechanical completion in March 2023, and will be delivered to Altamira for commencement of operations soon thereafter.

94.    The above-referenced statements were materially false and/or misleading when made because: (a) the Individual Defendants did not expect, and had no reasonable basis to expect,

to achieve "mechanical completion" in March 2023; and (b) the statements omitted the following known material, non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (2) as confirmed by former employees (including FE1, FE3, FE7, and FE10), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (3) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (4) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

95.     On November 2, 2022, the Company hosted its FLNG Investor Day at the Corpus Christi, Texas, construction site for the Altamira FLNG Project. The Company also issued a press release titled *NFE Increases 2022 and 2023 Earnings Goals, Hosts FLNG Investor Day at Shipyard in Texas*. The press release stated:

> NEW YORK -- (BUSINESS WIRE) -- Nov. 2, 2022 -- New Fortress Energy Inc. (NASDAQ: NFE) ("NFE" or the "Company") announced today at its FLNG Investor Day in Texas that the Company is raising its full year 2022 Illustrative Adjusted EBITDA Goal to ~$1.1 billion (from $1.0+ billion) and its full year 2023 Illustrative Adjusted EBITDA Goal to ~$2.5+ billion (from $1.5+ billion).
>
> The increases in NFE's illustrative goals are due to portfolio optimization and higher operating margins in our core business lines, as well as – most significantly – the expected on-schedule deployment of our first floating liquefaction unit ("FLNG 1") in the first half of 2023.
>
> ***
>
> NFE is hosting its FLNG Investor Day today at the Kiewit Offshore Services

("KOS") shipyard near Corpus Christi, Texas. Specializing in the fabrication and integration of offshore projects, the 555-acre KOS facility is home to NFE's Fast LNG program and the ongoing conversion of marine infrastructure into floating liquefaction units.

"We are proud of the efficient and repeatable process we have developed – essentially an FLNG factory – that substantially reduces the cost and time to build incremental liquefaction capacity the global energy market so urgently needs," continued Mr. Edens. "We are pleased to host investors and analysts today at this world-class facility in Texas, where they have an opportunity to see the significant progress we are making toward mechanical completion of our first FLNG unit in March 2023."

96.     The above-referenced statements were materially false and/or misleading when made because: (a) the Individual Defendants did not then expect, and had no reasonable basis to expect, "on-schedule deployment" of the Altamira FLNG Project; (b) the Company had not developed an "efficient and repeatable process" to construct LNG facilities; and (c) the statements omitted the following known material, non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) the EBITDA that investors were told to expect depended upon timely construction, commissioning and operation of the Altamira FLNG facility, which was highly unlikely if not impossible at that time; (2) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (3) as confirmed by former employees (including FE1, FE3, FE7, and FE10), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (4) as described by FE12, the Company created an illusion that progress was further along than it truly was by, among other things, portraying key components as completed when in fact they were not, such as the FLNG unit's turbines; (5) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (6) by failing to take standard safety measures and pressuring

31

employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

97.    On November 8, 2022, the Company reported its quarterly earnings for the third quarter of 2022, *i.e.*, 3Q22.  The Company issued a press release and hosted an investor conference call.

98.    The Company's press release titled *New Fortress Energy Announces Third Quarter 2022 Results* stated:

> NEW YORK -- (BUSINESS WIRE) -- Nov. 8, 2022 -- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the third quarter of 2022.
>
> \*\*\*
>
> We are on track to achieve our Illustrative Adjusted EBITDA Goal of ~$1.1 billion for 2022
>
> > Recently announced increase of 2023 Illustrative Adjusted EBITDA Goal to ~$2.5+ billion (from ~$1.5+ billion), and Illustrative Adjusted EBITDA Goals of ~$4+ billion and ~$5+ billion for 2024 and 2025, respectively
> >
> > Increase in 2023 earnings goals driven primarily by expected Deployment of FLNG 1 in the first half of 2023, as well as higher expected operating margins and continued LNG portfolio optimization.
>
> \*\*\*
>
> Construction of our Fast LNG units is progressing rapidly with the first FLNG unit expected to achieve Mechanical Completion in March 2023 and commence Operations by mid-2023.

99.    The above-referenced were materially false and/or misleading when made because: (a) the Individual Defendants did not then expect, and had no reasonable basis to expect, "Deployment" of the Altamira FLNG Project in the first half of 2023; (b) the Company had not developed an "efficient and repeatable process" to construct LNG facilities; and (c) the statements

omitted the following known material, non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) the EBITDA that investors were told to expect depended upon timely construction, commissioning and operation of the Altamira FLNG facility, which was highly unlikely if not impossible at that time; (2) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (3) as confirmed by former employees (including FE1, FE3, FE7, and FE10), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (4) as described by FE12, the Company created an illusion that progress was further along than it truly was by, among other things, portraying key components as completed when in fact they were not, such as the FLNG unit's turbines; (5) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (6) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

100.    Defendants Edens and Guinta participated in the investor conference call on November 8, 2022. During the investor conference call, Defendant Guinta stated:

> The first unit will begin operations in May or June 2023, and then the remaining 5 will turn on before the end of September 2024, so less than 2 years from now. This will result in 161 TBtu in volumes next year, growing to 464 TBtu for 2025.
>
> Now let's turn to Slide #10 and talk about the progress in FLNG. As you know, and many of you attended, we hosted an investor and an analyst event last week in Kiewit shipyard in Corpus Christi, and it's a great opportunity for us to give investors a glimpse of the progress we have made. As we mentioned on site, nothing that we're doing is overly complicated or difficult, but it does require the team to be organized, efficient and accountable to one another.

The 2 key takeaways from the event last week and the highlights of the quarter are: one, we are making excellent progress on FLNG #1 and expect to achieve mechanical completion on March 17 and then have the asset deployed and operating in May and COD in June 2023. Second, we made huge progress in the deployment options, including permits for our various locations, which we'll outline in a couple of slides. As mentioned, our FLNG 1 is rapidly approaching completion. On the modules in the top left of this page, there's a picture showing where we assemble the modules that will be lifted under the jack up rigs. Module 1 for gas treatment goes on the first rig, module 2 the liquefaction goes onto the second rig and then we'll have 1 smaller module for utilities and accommodations that goes on to the third rig. Each of these large modules will be 4 to 7 levels high, when completed will weigh over 5,000 tons.

Below is a picture of the jack up rigs where the modules will be installed. We've completed the demolition and are nearing the completion of the whole strengthening and enhancements to the foundation as well as a complete overall and upgrade of the marine systems.

Further, we're in the middle of preparing for deployment and operations once the FLNG construction has been completed. We've hired our commissioning team that's working to commission as much of the asset in the yard as possible. Once the system is completed, we can work to activate and test immediately.

Regarding installation, we're doing things to have all subsea tie-ins, pipelay, mooring, riser work completed in order to ensure that once the FLNG is on site, we can immediately begin operations. And in operations itself, our team of people has already begun training and simulations to be ready to operate the asset once it's on location.

101.    The above-referenced statements were materially false and/or misleading when made because: (a) the Altamira FLNG Project was not then "rapidly approaching completion"; (b) the Individual Defendants did not then expect, and had no reasonable basis to expect, March 2023 "mechanical completion" or the "May or June 2023" Commercial Operations Date (COD); and (c) the statements omitted the following known material, non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) commissioning could not meaningfully or properly occur because construction of major systems had not been completed; (2) construction was not proceeding efficiently but rather was undermined

by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (3) as confirmed by former employees (including FE1, FE3, FE7, and FE10), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (4) as described by FE12, the Company created an illusion that progress was further along than it truly was by, among other things, portraying key components as completed when in fact they were not, such as the FLNG unit's turbines; (5) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (6) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

102.    On December 13, 2022, the Company held a special investor conference call to discuss its decision to issue a $3.00/share dividend. Defendants Edens and Guinta participated in the call on behalf of the Company. Defendant Edens stated:

> So in fact, if you look at Page #6, this gives a very kind of vivid depiction of this. 2019, our adjusted EBITDA, negative $115 million, that was in the growth stage of the company. 2020, we basically broke even, made $33 million. Last year, $605 million. This year, approximately $1.1 billion. And then next year in years forward, it goes up materially now, so $2.5 billion plus next year and beyond that in 2024. The CapEx on the bottom line is impressive. We actually invested $377 million in 2019, $157 million in 2020. And then last year and this year, those numbers have increased substantially. $669 million last year, $800 million to $900 million this year, $2 billion plus.
>
> There's -- it's not like 39% and 61% was the wrong number or 60-40 is absolutely the correct one. But what it does is when we look at the planned expenditures that we've got for CapEx, we can see that we can fund ourselves very readily with the liquidity and the cash on hand and the earnings that we have and still allow for a meaningful dividend. And so that's the judgment that we're making at the end of the day. It is not, by my measure, an aggressive policy whatsoever. I think that with the business environment that we're in, with the position that we're in, which is a very, very fortunate one, we have more than adequate capital to fund our business,

and this is the right step to take.

\*\*\*

So that's all. And Chris here as well, to answer any questions on the financial side. And of course, I'm here to answer questions, but our dividend is, we're going to pay $3 in this first dividend. The goal is basically to pay a dividend twice a year. So we think the right period to kind of measure this is the first half of the year and the second half of the year. The dividend is -- the record date to be a recipient of the dividend is January 4th. The payment date is January 13th. So for those shareholders that are actually owners on the 4th and they'll receive it on the 13th. Our goal then would be roughly in the second half of the year. So the figure after the first half is done, so July or early August, will actually have a similar conversation to this. And our goal is to obviously be consistent with this. We feel very good about our forecast for next year. We feel like the environment is a good one, and we're well underway. Obviously, what this does reflect is a significant amount of confidence in both the market for our products as well as the timing for the supply that we're bringing online. So there's no real update to that. We had an earnings call here and the Investor Day and kind of demonstrated that the bottom line is kind of on time and on budget is what our expectations are. And there's nothing we see that actually gets in between now and then.

Obviously, March, April, May are not very far away. We sit here in the middle of December. So there's a lot of work to be done, but we feel obviously good about it and the confidence in our ability to deliver on that is in part reflected on this, but it's not irrational exuberance by any means, it's something that reflects kind of the day-to-day activities of our business.

\*\*\*

**Tuohy Brothers Investment Research**: So first, I want to make sure I understand this correctly. First part, getting the obvious [ streets ] a little below guidance. And the second point that at a 40% payout ratio, the announced dividend run rate implies beating guidance. Am I saying that wrong?

**Defendant Edens**: I'm not -- I'm sorry, Craig, I couldn't hear kind of clearly. I think that the 40% payout rate with $3, annualized $6 does give you guidance with respect to what we think the EBITDA is for sure. And obviously, we think it's going to be substantially greater next year than it is this year. And that's -- and we have actually tremendous visibility into that. So that's obviously what is driving it. And trying to -- I feel like effective dividend policy is one or not -- there's not only a dividend declared, but there's also a paradigm that's used to actually show how it is constructed. So people can then base their expectations on both current and future dividends based on what the actual performance of the business is. And so we obviously feel very confident about the performance of the business next year, and we're making a dividend announcement as a reflection of that. And we think that

36

that's the right path to take.

**Tuohy Brothers Investment Research**: Sure. I guess just to clarify, when you say $2.5-plus billion next year, EBITDA, this dividend suggests an emphasis on the plus.

**Defendant Edens**: I missed just the very last part. The $2.5 billion EBITDA. Sorry, I just missed the last sentence. I couldn't actually understand clearly.

**Tuohy Brothers Investment Research**: I apologize this. I'm just saying that the dividend announcement would suggest the plus and the $2.5-plus billion is being emphasized as we expect to be able to exceed that number.

**Defendant Edens**: That's correct. No, your math is right. So…

***

**BofA Securities**: Just as your -- it appears that this is a forward-looking number, which you've -- how do you -- how are you thinking about -- how should we think about how much of that is locked in? And how much margin of safety you've built into that forecast or that forecasted dividend that you're going to pay out?

**Defendant Edens**: Yes, there's -- it's -- from my standpoint, it is not really forward-looking based on kind of the business flows and the transactions that we have in hand. So we feel like it is reflecting the reality of the business more so than projecting kind of some forward results. And we've been very clear about what we think the future holds. We have, obviously, a lot of tools at our disposal to make these numbers. And feel really good about it. I think that we do mitigate a substantial amount of our risk through a variety of different measures. There's the easiest way to lock in provinces to sell supply. We've done a lot of that. The second easiest way to do it is to hedge it. And obviously, there's a lot of factors you can take into consideration there, but we've done that as well. So there's variability. I'd say the most significant variability from my standpoint is in the second half of the year, not the first half of the year, and that just simply relates to when the FLNG turns on. And I think that for those of you that went down to our site visit in Corpus, I think that everyone is there hopefully understands it's merely a question of when, not if. And obviously, a month or 2 or 3 can make a difference.

We believe strongly in the timelines that we have communicated with people. So we're going to have mechanical completion in the spring. We're going to get this thing off of the dock and into the water in April, May and turned on in June. I mean that's what the plan is, and we feel great about that plan. And so -- but I think that when you look at the -- from our standpoint, when we look at the numbers, there's more variability in the second half of the year than the first half of the year as a result of that. But even with that, there's a very substantial amount of earnings and cash flows that are generated in the ordinary course of the business. So it's not --

37

that's why I say this -- we don't feel like this is a speculative position we're taking at all. So it really just reflects the business.

103.    The above-referenced statements were materially false and/or misleading when made because: (a) the "$2.5 billion plus" EBITDA number that Edens told investors to expect and characterized as not "forward-looking" was not based, as he represented, on the business "in-hand" and the Altamira FLNG Project progress; and (b) the Individual Defendants did not then expect, and had no reasonable basis to expect, "mechanical completion in the spring [of 2023]" or to have the Altamira FLNG Project "off the dock and into the water in April, May and turned on in June [2023]."

104.    The above-referenced statements also omitted the following known material non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) commissioning could not meaningfully or properly occur because construction of major systems had not been completed; (2) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (3) as confirmed by former employees (including FE1, FE3, FE7, and FE10), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (4) as described by FE12, the Company created an illusion that progress was further along than it truly was by, among other things, portraying key components as completed when in fact they were not, such as the FLNG unit's turbines; (5) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (6) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

38

105.    Defendant Edens' statements about the Company ability to fund a $6/share annualized ($3 semi-annual) dividend were wildly misleading in light of the true status of the Altamira FLNG Project.  Given that construction had already been delayed for the reasons stated above and construction and commissioning problems still had not been resolved, Defendant Edens did not then have a reasonable basis to assert that the Company had the free cash flow necessary to make the next $3 semi-annual dividend payment let alone to fund such immense payments indefinitely beyond that.  Despite this, Defendant Edens represented repeatedly and emphatically that New Fortress was capable of funding the dividend based on the business that existed.  The fact that New Fortress never paid another such dividend suggests that even it and Defendant Edens did not believe such statements to be true when made.  Worse still, Defendant Edens made sure that investors, analysts, and credit agencies relied on his statements by touting his "tremendous visibility" into the Company's business and the Altamira FLNG Project in particular.

106.    On February 28, 2023, the Company reported its quarterly earnings for the fourth quarter and year of 2022, *i.e.*, 4Q22.  The Company issued a press release and hosted an investor conference call.

107.    The Company's press release titled *New Fortress Energy Announces Fourth Quarter and Full Year 2022 Results*, stated:

> NEW YORK -- (BUSINESS WIRE) -- Feb. 28, 2023 -- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the fourth quarter and for the year ended December 31, 2022.
>
> We achieved our Illustrative Adjusted EBITDA Goal of ~$1.1 billion for full year 2022
>
>> Today we are announcing a 2023 Illustrative Adjusted EBITDA Goal of ~$2.0 billion
>>
>> Our 2023 Illustrative Adjusted EBITDA Goal, if achieved, would result in a near-doubling of Adjusted EBITDA and Adjusted Net Income in 2023

39

relative to 2022

\*\*\*

Construction of our FLNG units' is progressing rapidly with the first FLNG unit expected to achieve Mechanical Completion in the Spring of 2023 and commence Operations by mid-2023.

108.    The above-referenced statement was materially false and/or misleading when made because: (a) the Individual Defendants did not then expect, and had no reasonable basis to expect, "Mechanical Completion in the Spring of 2023" or to have the Altamira FLNG Project "commence Operations by mid-2023"; and (b) the statements omitted the following known material, nonpublic information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (2) as confirmed by former employees (including FE1, FE3, FE7, FE10, and FE12), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (3) as described by FE12, the Company misrepresented the progress being made at the Corpus Christi construction site; (4) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (5) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

109.    In addition, despite lowering the EBITDA target from $2.5 billion-plus to $2 billion, the press release still created the materially misleading impression that an earnings target of $2 billion was realistic. It was not. Construction to date at the Altamira FLNG Project had

40

already been severely delayed and was suffering from a disorganized and chaotic work schedule, as described in detail. Moreover, the FLNG unit was incomplete with critical systems still missing, uninstalled, and malfunctioning, as described above. This created an acute yet undisclosed material risk that the Altamira FLNG Project would not be completed by "Spring of 2023" and that operations would not commence by "mid-2023," thereby negating any realistic chance of meeting (or coming close to meeting) the new 2023 earnings targets.

110.    Defendants Edens and Guinta participated in the investor conference call on February 28, 2023. During the investor conference call, Defendants Edens stated:

> Liquefiers, we talked about a lot. We hosted an Investor Day down at the end of last year. The first one is basically near completion. Chris will give us an update on that. But the first one is the most important. It's basically the way to fully integrate our business, it's the way to kind of get proof of concept of accessing gas and an offshore capacity. So lots more to talk about with that. But we've made significant progress. And this year, we've kind of shifted our focus from the mechanical completion of the unit, which is closed, to now the deployment of it, the transfer of it and, of course, the operations of it.

> \*\*\*

> Liquefiers, I said we're closing on mechanical completion. Transport, installation, operations now become the things that we're very focused on. The time line is short. So we're in -- we've gone from triple-digit days to double-digit days. And so we have, as Chris has talked about before, we have a daily call on this. And our teams are working very, very hard on this.

111.    The above-referenced statements were materially false and/or misleading when made because: (a) the Altamira FLNG Project was not then "basically near completion"; (b) the FLNG unit's liquefiers were not "closing on mechanical completion"; (c) the Company employees and contractors were then attempting to complete significant remaining construction tasks and had not "shifted [their] focus" to "deployment"; (d) the remaining "time line" for mechanical completion, installation, commissioning and other tasks required prior to commencing "operations" was not then "short"; and (e) the statements omitted the following known material,

41

non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (2) as confirmed by former employees (including FE1, FE3, FE7, FE10, and FE12), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (3) as described by FE12, the Company misrepresented the progress being made at the Corpus Christi construction site; (4) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (5) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

112.    Defendant Guinta elaborated on Defendant Edens' statements during the call:

Turning to Slide #16. And frankly, the headline here says it all. We're less than 100 days away from our first FLNG setting sail to its home in Altamira, Mexico. With construction nearing completion, we're focused on installation, commissioning and operational readiness. Regarding our installation, the pipe lay barge is on location today and loading pipe. Late this week, it will begin the short pipe lay work to connect the [indiscernible] pipeline and our FLNG location, and that's expected to take around 3 weeks. We will then perform the hot tap and connect subsea pipe to our risers, which will ensure that all subsea activity will be completed prior to the FLNG arriving in the field.

For commissioning, we've hired a commissioning team to work in partnership with representatives from our original equipment manufacturers to commission as much of the asset in the yard as possible. The construction site provides access to natural gas, power and utilities, which enable us to test major components such as gas turbines at the Kiewit yard. Also, we can do shore-based testing and validation of controlled safety systems, instrumentation and process optimization, all while the assets are getting final touches completed. The onshore commissioning capabilities reduces a typical offshore commissioning time line by around 6 weeks.

Finally, regarding operations, we've hired our installation, training and offshore

42

management teams, including our Board operators and maintenance technicians. And these folks are working through our critical operating procedures as well as training simulators now and are being used to complete competency training. We've established our shore base at the Port of Altamira for storage needs, commission activities and ongoing operations.

So what does all this mean? Turn to Slide #16, and let me update you on the time line from today through COD. The current estimate for mechanical completion of our first rig is May 2023. This includes a staggered readiness of the 3 rigs and the final is expected to be completed in early June. As mentioned on the previous slide, we have the ability to commission systems on a rig-by-rig basis, and we've sequenced the rigs to maximize readiness ahead of the offshore hookup. We're starting in the field construction activities this week, including the pipe lay and other makeready activities to receive the [ FOCs ]. Rigs will be towed from the Yard to Altamira as they are completed and full offshore hookup is expected to be completed in June. This includes the station of the rigs on location and also the installation of the Penguin FSRU. First gas is expected to the units in late June, and our first LNG production will be July 2023 and expect to hit COD in August of 2023.

113.    The above-referenced statements were materially false and/or misleading when made because: (a) construction of the Altamira FLNG Project was not "nearing completion"; (b) the Individual Defendants did not then expect, and had no reasonable basis to expect, "mechanical completion of our first rig [in] May 2023," the final rig completion in early June 2023, "first LNG production" in July 2023, or full commencement of commercial operations in August 2023; and (c) the statements omitted the following known material non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) commissioning could not meaningfully or properly occur because construction of major systems had not been completed; (2) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (3) as confirmed by former employees (including FE1, FE3, FE7, FE10, and FE12), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (4) the decision to deploy repurposed, used jack-up rigs exposed

43

the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (5) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

114.    During the question-and-answer portion of the call, Defendant Edens continued to misrepresent the true status of the Altamira FLNG Project while ensuring analysts of New Fortress' ability to generate "high quality, repeatable, predictable earnings." In response to an analyst question, Defendant Edens stated:

> **BofA Securities**: That's great. I much appreciate it. If I could just quick follow-up on that. Wes, you mentioned a very measured approach to deploying new supply via FLNG. I just -- I want to dig in there a little bit. Is that to imply that before you bring on additional FLNG volumes, you'll want to have contracted offtake agreements in hand? Or in other words, are we not to expect these FLNG volumes to be purely merchant volumes but rather have dedicated offtake agreements prior to them coming online?

> **Defendant Edens**: Yes, it's the latter. It's really a -- there's not a hard and fast rule about it, but we want to have clean line of sight to half of the volume is being deployed before we actually turn the unit on. That said, these units take a while to build. We are nearly done with #1, and we have #2 and 3 well under development. So we've got stuff that is on the back burner, basically moving ahead. The volumes at this point would be 2024 volume, so still volumes that would be in a market which prospectively could be quite a tight one. And so the merchant volumes could be very valuable to us at that point in time. But we don't want to interject a lot of market volatility into the earnings. We're on a path to high quality, repeatable, predictable earnings.

115.    Defendant Edens' above-referenced statement was false and/or materially misleading because the Company was not "nearly done" with the FLNG unit for the Altamira FLNG Project. To the contrary, the unit was far from complete and even further from commissioning and operating. As described above, construction was ongoing with critical components missing and/or malfunctioning, according to former employees. Consequently,

44

Defendant Edens had no basis to assure analysts and investors that the Altamira FLNG Project would be capable of generating "high quality, repeatable, predictable earnings" at any point in the near future, if ever.

116.    Defendant Guinta also participated in the question-and-answer portion of the call. In response to an analyst question about the Company's basis for the $2 billion EBITDA target, Defendant Guinta assured the analyst that its EBITDA projections had "very little volatility" and "very little at risk." Defendant Guinta stated:

> **BTIG, LLC**: I was hoping to talk a little bit about the updated EBITDA guidance and kind of maybe some of the puts and some of the takes. You mentioned the volumes. Kind of curious if you've adjusted your spread assumptions around the EBITDA guidance. And then as we think about that $2 billion number, just looking at consensus, it is still a little bit above where the street is. So really just kind of trying to understand how we should be thinking about it and maybe where some of that delta might be.
>
> **Defendant Guinta**: Yes. Greg, so to answer the question, I mean, we had $2.5 billion we talked about at the last earnings call. $2 billion now of that -- the difference is really just FLNG timing and the downstream execution, as Wes has talked about on this call. We feel really good about it, too. It is above where a lot of the estimates are today. There's very little volatility in that $2 billion. We feel really comfortable about that. Certainly, the $2.5 billion included a little bit more volumes under the FLNG scenario and it had a little bit of a higher strip. But as Andrew has said, we've termed out more and more of that gas since we announced the call in November of 2022. So very little at risk, and we feel great about the $2 billion for 2023 calendar year.

117.    The above-referenced statements were materially false and/or misleading when made because: (a) the EBITDA figures guided by management had enormous "risk" and "volatility"; and (b) in stating that the EBITDA figure had previously been reduced from $2.5B to $2B due to "FLNG timing and the downstream execution," Defendant Guinta omitted the following known material non-public information impacting additional delay and EBITDA reduction, all of which were necessary to make the statements not misleading under the circumstances under which they were made: (1) construction was not proceeding efficiently but

45

rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (2) as confirmed by former employees (including FE1, FE3, FE7, FE10, and FE12), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (3) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (4) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

118. Additionally, despite acknowledging that the reduction in guidance was due to "FLNG timing," Defendant Guinta virtually guaranteed the revised $2 billion target. Defendant Guinta repeatedly indicated his confidence in the $2 billion target, stating that there was "very little volatility" in the target with "very little at risk." In reality though, the timing of the FLNG unit was very much at risk and subject to immense volatility considering that construction had been (and was continuing to be) extremely delayed with key systems not yet installed or malfunctioning, as described above.

119. Shortly after Defendant Guinta's statement above, Defendant Edens added on that New Fortress was "days away" from obtaining "proof of concept" with respect to the FLNG unit. Defendant Guinta stated:

> Number two, I think the question about the businesses are really good at this, right? So it's something that we feel like we've demonstrated a pretty good capacity to do things. We're not perfect. We're learning every day. We've got a great group of people. But I think that we now have a very, very good proof of concept at every level that -- except for the FLNG, which you are now days away from having proof of concept with. So we feel like that's pretty good.

120. Defendant Edens' statements identified above were materially false and/or

misleading when made because the Company was not then "days away" from having "proof of concept" with the FLNG unit, meaning the unit could and would produce LNG or First Gas. Instead, key components and systems still needed to be installed and repaired, as described above

121.    On April 4, 2023, the Company issued its 2023 Proxy Statement, solicited by the Director Defendants, which sought shareholder approval for, *inter alia*: (i) the re-election of Defendants Mack and Wanner to the Board; and (ii) executive compensation.

122.    The 2023 Proxy Statement contained the following:

**Code of Conduct**

As mentioned above, the Board of Directors has adopted the Code of Conduct, which is available on our website, that applies to all of our officers, directors and employees, including our principal executive officer and principal financial officer. The purpose of the Code of Conduct is to promote, among other things:

*   honest and ethical conduct;

*   maintenance of accurate financial records and adherence to applicable accounting rules and policies;

*   compliance with applicable governmental laws, rules and regulations; and

*   accountability for adherence to the Code of Conduct and the reporting of violations thereof.

*Risk Oversight*

The Company's risk management is overseen by the Chief Executive Officer, who receives reports directly from employees and individuals who perform services for the Company. Material risks are identified and prioritized by management, and material risks are periodically discussed with the Board of Directors. The Board of Directors regularly reviews information regarding the Company's credit, liquidity and operations, including risks and contingencies associated with each area. In addition to the formal compliance program, the Board of Directors encourages management to promote a corporate culture that incorporates risk management into the Company's corporate strategy and day-to-day business operations.

123.    In discussing Risk Oversight, the 2023 Proxy Statement failed to disclose the risks arising from the fact that construction was not proceeding efficiently and that the issued timelines

47

for the Altamira FLNG Project had no reasonable basis and were unrealistic which was known, or should have been known to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statement in the 2023 Proxy Statement regarding Risk Oversight was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

124.    Furthermore, the Director Defendants' statement regarding the Company's Code of Conduct was materially false and misleading because the Director Defendants were not adhering to the Code of Conduct and were, in fact, acting in violation of the Code of Conduct.

125.    On the basis of the foregoing false and misleading statements, shareholders approved, among other things, the re-election of Defendants Mack and Wanner to the Board, thereby enabling them to continue breaching their fiduciary duties to the Company and causing harm to the Company. Had the 2023 Proxy Statement not been false and misleading, then shareholders would not approved the re-election of Defendants Mack and Wanner, meaning the Company would not have suffered harm from the continued breaches of fiduciary duty as alleged herein.

126.    On May 4, 2023, the Company reported its quarterly earnings for the first quarter of 2023, *i.e.*, 1Q23. The Company issued a press release and hosted an investor conference call.

127.    The Company's press release titled *New Fortress Energy Announces First Quarter 2023 Results*, stated:

> NEW YORK -- (BUSINESS WIRE) -- May 4, 2023 -- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the first quarter of 2023.

***

On track to achieve our Illustrative Adjusted EBITDA Goal of ~$2.0 billion for 2023

\*\*\*

Construction of our first Fast LNG unit is 90%+ Complete and Deployment to Altamira is expected in June 2023

> We expect to complete Commissioning of our first Fast LNG unit in the shipyard and on-location at the Altamira site and continue to anticipate First Gas and COD in July 2023 and August 2023, respectively.

128.    The above-referenced statements were materially false and/or misleading when made because: (a) construction of the LNG unit was not then "90+% Complete"; (b) the Individual Defendants did not then expect, and had no reasonable basis to expect, "First Gas and COD in July 2023 and August 2023, respectively"; and (c) the statements omitted the following known material, non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) commissioning could not meaningfully or properly occur because construction of major systems had not been completed; (2) even for the LNG unit, much work remained before the Company would have any sense of how close it was to completing construction, including a nitrogen run test; (3) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (4) as confirmed by former employees (including FE1, FE3, FE7, FE10, and FE12), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (5) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (6) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further

49

delays due to equipment failure.

129.    Additionally, the press release perpetuated the materially misleading impression that an earnings target of $2 billion was realistic. It was not. Construction was not nearly done and would not be completed while onshore, meaning that commissioning would not be completed before deployment. As described above, construction was ongoing with critical components missing and/or malfunctioning, according to former employees.    Thus, in addition to misrepresenting the FLNG unit's status of completion, the above statements concealed an acute yet undisclosed material risk that the Altamira FLNG Project would not be completed on time, thereby negating any realistic chance of meeting (or coming close to meeting) the 2023 earnings targets.

130.    Defendants Edens and Guinta participated in the investor conference call on May 4, 2023.  During the investor conference call, Defendant Guinta stated:

> Turning to Slide #13. Our first Fast LNG project is nearing completion. At this point, we're executing the final phases of our construction program while we prepare for offshore operations. The modules have been completed, lifted and set on the rigs and are currently undergoing integration and testing. The pipelay and mooring anchor installation is complete and awaiting rigs to arrive on site.
>
> Our team is expecting to have the rigs sail from Ingleside over the next 30 to 60 days and gas to be introduced into the system in the month of July. Finally, our expectation is that we will announce COD in August. Our full commissioning team is on location in Ingleside now and working to complete as much commissioning in the yard as possible in order to shorten the time between first gas and COD.

131.    The above-referenced statements were materially false and/or misleading when made because: (a) the "construction program" for the Altamira FLNG Project was not then in "the final phases"; and (b) the statements omitted the following known material, non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) commissioning could not meaningfully or properly occur because construction of major

50

systems had not been completed; (2) even for the LNG unit, much work remained before the Company would have any sense of how close it was to completing construction, including a nitrogen run test; (3) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (4) as confirmed by former employees (including FE1, FE3, FE7, FE10, and FE12), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (5) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (6) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

132.    On August 8, 2023, the Company reported its quarterly earnings for the second quarter of 2023, *i.e.*, 2Q23. The Company issued a press release and hosted an investor conference call.

133.    The Company's press release titled *New Fortress Energy Announces Second Quarter 2023 Results*, stated:

NEW YORK -- (BUSINESS WIRE) -- Aug. 8, 2023 -- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the second quarter of 2023.

\*\*\*

Illustrative Adjusted EBITDA Guidance for 2023 revised to $1.6 billion to reflect lower expected cargo earnings and timing of infrastructure projects coming online, while 2024 guidance reiterated at $2.4 billion

\*\*\*

Fast LNG Mechanically completed each of our modules and three rigs on FLNG 1, with our Pioneer III rig successfully installed offshore in August

Expecting to complete and install the remaining two FLNG rigs in August and introduce First Gas and achieve COD in September

134.    The above-referenced statements were materially false and/or misleading. when made because: (a) construction of each module and the three rigs comprising the Altamira FLNG Project was not then "mechanically completed"; (b) the Individual Defendants did not then expect, and had no reasonable basis to expect, to complete installation in August 2023, or to "introduce First Gas and achieve COD" in September 2023; and (c) the statements omitted the following known material non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (2) as confirmed by former employees (including FE1, FE3, FE7, FE10, and FE12), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (3) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; and (4) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure.

135.    Additionally, given the FLNG unit's true status of completion, the above statements also created and concealed an acute and material risk that the Altamira FLNG Project would not be completed on time which, in turn, materially undermined New Fortress' 2023 and 2024 earnings targets.

52

136.    On August 8, 2023, Defendants Edens and Guinta participated in an investor conference call to discuss the Company's financial results for the second quarter of 2023. During this investor conference call, Guinta made the following materially false and misleading statements:

**Defendant Edens**: . . . Compared to the first half of last year, we're up significantly. So $541 million last year in the first half, $686 million. And this year, perhaps more importantly, the guidance that we see now for the rest of the year, $1.6 billion for 2023 and $2.4 billion in 2024. A little bit of reduction of guidance for this year, just as a function of a few of the projects delivering late but still very, very solid earnings for the rest of the year and our future is incredibly bright.

\*\*\*

So Page #5. These are a list of the projects. So there's FLNG 1, which Chris Guinta will talk about, the liquefier, which is in the process of being deployed as we speak. It's materially complete.

\*\*\*

**Defendant Guinta**: Great. Thanks, Wes. Good morning, everybody. Please turn to Slide #8, and we provide some added details on the completion of Fast LNG number 1. So as mentioned, thanks to the incredible effort by our team in Corpus Christi and in Mexico. We continue to make major progress, and we're nearing our goal of COD by the end of this quarter.

At this point, each of the rigs have achieved mechanical completion, and we're in the process of commissioning various systems while the remaining rigs are still in the Kiewit shipyard. As a reminder, FLNG is comprised of 3 specific rigs with the names Pioneer 1, 2 and 3. Pioneer 1 is the gas processing module. This is connected to the subsea riser and it dehydrates and prepares the gas for liquefaction. This unit is expected to mobilize and be installed around August 23. And Pioneer 2 is the liquefaction module that includes the chart, cold box and Baker Hughes compressor, which together changed the vapor into LNG. This unit is expected to mobilize and be installed around August 28. Pioneer 3 has the accommodations, power and electrical control hub, and this is the unit that has already been mobilized and installed offshore.

From a marine construction standpoint, all activities have been completed, including the installation of the hot tap assembly on the [ sur de pass ] pipeline, a 3-kilometer pipeline lateral to our FLNG asset and the anchor mooring installation for our storage vessel. In addition, our floating storage vessel, the Penguin has completed all of its make-ready activities and currently in transit to Altamira where

53

it will clear in and hook up to its installed moorings later this month. The next step is to sail units P1 and P2 over the next couple of weeks to their location offshore, and then we expect to introduce first gas in September and sell our first cargo in October of 2023.

137.    The above-referenced statements were materially false and/or misleading when made because: (a) construction of the Altamira FLNG Project was not then "materially complete"; (b) the Individual Defendants did not then expect, and had no reasonable basis to expect, to complete installation in August 2023, or to "introduce first gas in September and sell our first cargo in October of 2023"; and (c) the statements omitted the following known material, nonpublic information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction was not proceeding efficiently but rather was undermined by chaotic execution, lack of planning, refusal to properly sequence, and failure to procure necessary parts; (2) as confirmed by former employees (including FE1, FE3, FE7, FE10, and FE12), the issued timelines for the Altamira FLNG Project had no reasonable basis and were internally known to be unrealistic; (3) the decision to deploy repurposed, used jack-up rigs exposed the Company to further construction delays because components had not been determined operable and many needed to be replaced; (4) by failing to take standard safety measures and pressuring employees to rush construction at all costs, the Company had created an environment that not only risked worker safety but exposed the Altamira FLNG Project to further delays due to equipment failure; and (5) New Fortress had not then conducted a standard nitrogen run test and therefore had no idea whether the crucial "cold box" that Guinta described functioned properly.

138.    Additionally, the Altamira FLNG Project were not "materially complete" and had not achieved "mechanically completion." In truth, construction was still ongoing with critical systems not yet installed and/or malfunctioning without any engineering support from Fluor Corporation, according to former employees. The FLNG unit's true status of completion negated

54

any realistic chance of the Company meeting the commissioning and production timelines of September 2023 and October 2023, respectively, as well as its earnings targets for the year.

139.    On November 8, 2023, the Company reported its quarterly earnings for the third quarter of 2023, *i.e.*, 3Q23. The Company issued a press release and hosted an investor conference call.

140.    The Company's press release titled *New Fortress Energy Announces Third Quarter 2023 Results*, stated:

> Completed sail away, installation, and First Gas for our first FLNG asset in offshore Altamira, Mexico; First LNG and COD expected by the end of the fourth quarter 2023.

141.    The above-referenced statements were materially false and/or misleading when made because: (a) the Company had not "completed sail away, installation, and First Gas," because construction and commissioning had not finished, critical systems were not yet installed and/or malfunctioned, and system integration work for the liquefaction plant was still incomplete; (b) the Individual Defendants did not then expect, and had no reasonable basis to expect, to commence commercial operations "by the end of the fourth quarter 2023"; and (c) the statements omitted the following known material non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) as confirmed by former employees, the Lloyd's insurance syndicate insuring the Altamira FLNG Project had placed New Fortress on notice of critical systems not working and threatened to withdraw coverage; (2) the FLNG unit's true status of completion negated any realistic chance of the Company meeting the production timelines provided in the above press release and, in turn, undermined any reasonable chance of meeting New Fortress' earnings targets; (3) the Company had further imperiled touted deadlines by terminating its engineering, procurement, and construction contractor, Fluor Corporation, in

55

mid-2023.

142.    Defendants Edens and Guinta participated in the investor conference call on November 8, 2023.  During the investor conference call, Defendants Edens and Guinta stated:

> **Defendant Edens**: . . . Actually, by far, the best operational quarter that we had hit in the history of the company. Many, many highlights to talk about in terms of what we've done on the operating side, but a few things to point out. Number one, first and foremost, in our view and many others out there. Our first FLNG unit is now firmly in place. It's been mechanically completed. It's in the field. It is connected to the pipeline. It's in the final stages of being commissioned, really a remarkable accomplishment by the entire team, 5.4 million man hours, 2.5 years. So a record of a liquefier in the world by every single measure and something we're quite proud of. And obviously, a real cornerstone of the supply side of our business.
>
> ***
>
> Look at Page 4 briefly, so the quarterly financial results. The 3 pillars kind of our earnings are quality, duration and growth. The -- as I said before, 100% of our earnings are coming from downstream customers, $208 million of adjusted EBITDA for the quarter. We are now in the last stage of the year. Our expectation is still the same, $1.6 billion in adjusted EBITDA for this year, $2.4 billion for next year, $1.6 billion, about $200 million of that we expect to come from gains on asset sales in the fourth quarter.
>
> So there could be some volatility there in terms of just the timing of those, but those are pretty straightforward. Notably, of the $2.4 billion that we are forecasting for next year, virtually all of it is already contracted. Of our $2.4 billion estimate for next year, all of it about $250 million is already contracted. So quality of cash flow is coming 100% from downstream customers, duration of our portfolio in excess of 12 years. And the growth, we currently only use about 25% of the capacity of our terminals. So there's a massive potential for organic growth going forward.
>
> ***
>
> **Defendant Guinta**: Yes. Thanks, Wes. Good morning, everybody. The progress in FLNG 1 is nothing sort of remarkable. We started the process of FLNG from a standing start on March 9, 2021. And in 31 months, we're proud to announce that we have gas into the system and expect to conclude commissioning by the end of the year. While a typical LNG project takes on average 5 to 7 years, but thanks to our incredible employees, contractors, equipment providers and regulators were nearing the completion of 1 of the world's most advanced offshore LNG facilities.
>
> So quickly, just a brief recap of what has occurred and an outline of what happens from here. Over the last 60 days, the remaining 2 rigs have moved from their

construction site in Corpus Christi to their permanent home in Altamira. All 3 rigs have been jacked up into position, connected to 1 another and hooked up to the subsea pipeline.

On Monday, we opened the valve of the subsea pipeline and moved the first gas molecules into our system. The nat gas then flows from the hot tap assembly through the riser to our rig and into our high-pressure let-down valve. From now through COD, the process will be to move gas into the turbines and complete commissioning of the power generation system and then move natural gas into our pretreatment module. Gas flows through the mixed refrigerant compressor and into the cold box, where LNG will then be produced.

Once LNG is produced, the LNG then flows into our floating storage unit, the NFE Penguin, which will arrive on site in about 10 days. Our team has done a phenomenal job completing the various construction work streams, methodically and safely commissioning critical equipment, and we expect to see the first drop of LNG in the next few weeks.

143.    Defendants Edens' and Guinta's statements identified above were materially false and/or misleading when made because: (a) the FLNG unit was not "firmly in place" or "mechanically completed," but instead construction and commissioning was still ongoing; (b) its team had not "done a phenomenal job completing the various construction work streams" or "methodically and safely commissioning critical equipment," and instead had skipped critical sequencing and safety tests, including a nitrogen run test; and (c) the statements omitted the following known material non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) as confirmed by former employees, the Lloyd's insurance syndicate insuring the Altamira FLNG Project had placed New Fortress on notice of critical systems not working and threatened to withdraw coverage; (2) the FLNG unit's true status of completion negated any realistic chance of the Company meeting the production timelines provided and, in turn, undermined any reasonable chance of meeting New Fortress' earnings targets; (3) the Company had further imperiled touted deadlines by terminating its engineering, procurement, and construction contractor, Fluor Corporation, in mid-2023.

57

144.    On February 29, 2024, the Company reported its quarterly earnings for the fourth quarter and year of 2023, *i.e.*, 4Q23. The Company issued a press release and hosted an investor conference call.

145.    The Company's press release titled *New Fortress Energy Announces Record Fourth Quarter and Full Year 2023 Results* stated:

> NEW YORK -- (BUSINESS WIRE) -- Feb. 29, 2024 -- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the fourth quarter and for the year ended December 31, 2023.
>
> Summary Highlights
>
> > Adjusted EBITDA of $388 million in the fourth quarter of 2023 and $1.3 billion in the full year 2023
>
> ***
>
> In Fast LNG, we successfully placed our first unit into its location and are now expecting first LNG in March and First Cargo in April 2024.
>
> ***
>
> In 2023, we generated significant increases in Funds from Operations per share, more than doubling compared to the full year 2022. Our Illustrative Goal is to nearly double these metrics again in the full year 2024.

146.    The above-referenced statements were materially false and/or misleading when made because they omitted the following known material non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction and commissioning were not then complete, steps that normally occur far before installation. In particular, piping and system integration work for the liquefaction plant was still incomplete. Moreover, as of February 2024, key components such as the mixed refrigerant compressor, which is essential for liquefying natural gas, was not commissioned. Numerous other components, such as the firewater system, hot oil system, LNG boil-off gas compressor, and

58

primary power sources for the rig, were not operational, as described by former employees. As FE12 confirmed, "hundreds" of "Priority A" tasks still remained incomplete as of February 2024; (2) as confirmed by former employees, the Lloyd's insurance syndicate insuring the Altamira FLNG Project had placed the Company on notice of critical systems not working and threatened to withdraw coverage; (3) the FLNG unit's true status of completion negated any realistic chance of New Fortress meeting the production timelines provided in the above press release and, in turn, undermined any reasonable chance of meeting the Company's earnings targets; and (4) New Fortress had further imperiled touted deadlines by terminating its engineering, procurement, and construction contractor, Fluor Corporation, in mid-2023.

147.    Edens and Guinta participated in the investor conference call on February 29, 2024. During the investor conference call, Defendants Edens and Guinta stated:

> **Defendant Edens**: . . . So Page 3. 2023 was a very good year. Fourth quarter, a record quarter 4 as well from an operating perspective, $1.3 billion in EBITDA, $388 million in EBITDA for the quarter, that more than doubled earnings per share and FFO for 2022 to 2023, and we're poised to roughly double that again this year. So tremendous financial results. Most importantly, when you look at the second line down, it's not a number, but it's the second line, the profit from cargo sales, you'll see 0 contribution essentially from cargo sales in Q3 and Q4, which now fully reflects that our business is operating on the -- through the terminals to our customers and our sales of gas and products in power. And so very much an operating company now from -- as opposed to a development company. And both the quantity and the quality of those earnings were terrific.
>
> ***
>
> Our Fast LNG lastly, there's a lot of news around that. So in short term, we installed the first of our facilities. We expect first LNG in the month of March and the first cargo in the month of April. So obviously, we're at the very, very tail end of that project. And while it's been a little bit delayed, it's important to note that it still would be the fastest LNG installation in the history of the planet. So we are always aggressive in terms of our objectives. But even with the [beats] slipping a little bit on balance, we feel very, very good about what we have done.
>
> ***

59

**Defendant Guinta**: Thanks, Andrew. Good morning, everybody. Let's flip to Slide 22 and talk through our FLNG projects. Over the last 3 years, we've assembled an amazing team of employees, contractors and construction partners that have been working around the clock to make our first FLNG unit a reality.

The headline is that we're in the final stages of commissioning and expect first LNG in late March and our first cargo to sale in April, on which I'll go into more detail shortly. But before I do, I want to share just a brief background of how we got to this point. As most of you listening are well aware, the LNG production market is dominated by super majors and national oil companies or by project-focused entities that require 20-year offtake agreements with investment-grade counterparties. At NFE, however, we have stood in the gap and built critical energy infrastructure in emerging markets that need access to LNG now. So in late 2020 and early 2021, we were seeking to add to our LNG supply portfolio and found it difficult to get the quantity and the duration that we required for 2 primary reasons.

First, a lack of overall supply in the market for the midterm period, notably 2024 through 2027. Given that all the [ land ] currently operating liquefaction projects were nearly 100% contracted. And second, as we were only a single B rated entity at the time, the credit support and project finance nature of the operating projects did not allow for them to sell substantial quantities to NFE.

So move to Slide 23, and let's talk about what we did as a response. As I've mentioned on this call before, West scheduled a daily call every week day morning for the last 3 years, where we aim to complete a solution that would be quick to market and allow us to serve the growing needs of our downstream customers. First, we sought to eliminate design slack that would require significant engineering contingencies and immediately went to work building the modules for gas treatment, liquefaction and power.

We executed on long lead procurement in order to focus on speed to market with industry-leading OEMs like Chart, Baker Hughes and Siemens. We purchased jack-up rigs to serve as the foundation for the modules, eliminating the long and difficult process of constructing purpose-built marine assets like ships or barges that have been done for other offshore liquefaction solutions. And of course, we chose topflight engineering and construction partners in Fluor, Kiewit, Arendal, Zentech and others to ensure excellent workmanship. So where did that get us?

We'll move to Slide 24, and you can see a recent photo of the FLNG unit on location. With respect to our first FLNG unit, we declared FID in March of 2021, and we will have first LNG in March of 2024, making this the fastest large-scale LNG project ever developed. We've completed over 8 million man-hours of construction to date. We've transported rigs to their location in Altamira, completed the hot tap and introduced feed gas for commissioning. And we have our LNG storage vessel, the NFE Penguin, securely moored and connected to the rigs awaiting LNG loading. Finally, the commissioning and operating teams are

60

aggressively working to produce first LNG, which is scheduled for late March, followed by the first cargo sailing in April.

I'm moving to Slide 25. And now that we're nearing the conclusion of commissioning for our first FLNG unit, we're turning our attention to FLNG 2, which has a much cheaper and faster deployment time frame given its onshore nature pristine pad site existing infrastructure and knowledge gained from FLNG 1. The modules are under construction now and will be completed in Q3 2025 and will then ship to Mexico for installation at Altamira terminal with expected completion in Q1 2026. The terminal was built by Shell and is in excellent operational condition. There's LNG in the tanks, full deepwater marine berthing capabilities and ample land to receive the modules. Quite frankly, you could not ask for a better location. FLNG 2 uses the exact same technology and design as FNG 1 but a completely different contracting strategy, one that allows us for much more certainty around price and schedule. We have a fixed price date certain contract for our modules and a fixed price date certain contract with our civil contractor for the onshore installation. We have 90% of the procurement already completed. And in many cases, the equipment is on location in the Kiewit Yard or ready to ship from the original equipment manufacturer. And finally, as Wes mentioned, we're excited to announce that we have secured committed financing for a $700 million loan for FLNG 2. To date, we have invested a little more than $300 million already, and the balance will be funded by the $700 million construction term loan.

148.    Defendants Edens' and Guinta's statements identified above were materially false and/or misleading when made because: (a) the Company was not then "at the very, very tail end of the [Altamira] project"; (b) the Individual Defendants did not then expect, and did not have a reasonable basis to expect, Altamira to be fully operational such that the first commercial LNG cargo could sail only two months later in April 2024; and (c) the statements omitted the following known material, non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction and commissioning were not then complete, steps that normally occur far before installation. In particular, piping and system integration work for the liquefaction plant was still incomplete. Moreover, as of February 2024, key components such as the mixed refrigerant compressor, which is essential for liquefying natural gas, was not commissioned. Numerous other components, such as the firewater system, hot oil

system, LNG boil-off gas compressor, and primary power sources for the rig, were not operational, as described by former employees; (2) as confirmed by former employees, the Lloyd's insurance syndicate insuring the Altamira FLNG Project had placed the Company on notice of critical systems not working and threatened to withdraw coverage; (3) the FLNG unit's true status of completion negated any realistic chance of the Company meeting the production timelines provided above and, in turn, undermined any reasonable chance of meeting the Company's earnings targets; (4) the Company had further imperiled touted deadlines by terminating its engineering, procurement, and construction contractor, Fluor Corporation, in mid-2023; (5) as of February 2024, almost nothing had been commissioned and key components, such the primary power sources for the rig, were not operational, according to former employees. As FE12 confirmed, "hundreds" of "Priority A" tasks still remained incomplete as of February 2024; and (6) the FLNG unit's true status of completion negated any realistic chance of the Company meeting the production timelines provided by Defendants Edens and Guinta and, in turn, undermined any reasonable chance of New Fortress "doubl[ing]" its 2023 earnings by year end.

149.    On March 25, 2024, the Company hosted a special investor call. During the call, Edens misrepresented the status of the Altamira FLNG Project. Defendant Edens stated:

> **BTIG, LLC**: How do these transactions affect your gas supply? I think you previously talked about roughly 120 TBtus annually coming from third parties. Just wondering how that delta shakes out and where are we on how FLNG 1 is progressing?
>
> **Defendant Edens**: In gas, this is. Gas [indiscernible] right now is actually quite matched, right? So our goal is to not take exposure to gas markets. The supply that we would need in Brazil, which is potentially significant, is all indexed to market. So you have kind of spot exposure versus spot market. So that's great. With respect to Puerto Rico right now, this is what we had anticipated.
>
> So we are, at this point, very matched with FLNG 1 coming online here any day. That's roughly 70 TBtus use of gas, FLNG 2, which we're now actually under construction or will be, there's another 70. So that's 140. So that's the supply that

62

we see kind of earmarked for Puerto Rico in the short to intermediate term. And obviously, if we are successful and expand our operations there, we would then look to expand our gas supply as well, which is kind of the next phase of it.

150.    Defendant Edens' statement identified above was materially false and/or misleading when made because the Altamira FLNG Project (referred to above as FLNG 1) was not "coming online . . . any day" at this point.  To the contrary, Defendant Edens knew but concealed that: (1) construction and commissioning were not then complete, steps that normally occur far before installation. In particular, piping and system integration work for the liquefaction plant was still incomplete. Moreover, as of February 2024, key components such as the mixed refrigerant compressor, which is essential for liquefying natural gas, was not commissioned. Numerous other components, such as the firewater system, hot oil system, LNG boil-off gas compressor, and primary power sources for the rig, were not operational, as described by former employees. As FE12 confirmed, "hundreds" of "Priority A" tasks still remained incomplete as of February 2024 and major installation work remained ongoing as of March 2024; (2) as confirmed by former employees, the Lloyd's insurance syndicate insuring the Altamira FLNG Project had placed the Company on notice of critical systems not working and threatened to withdraw coverage; and (3) as of February 2024, almost nothing had been commissioned and key components, such the primary power sources for the rig, were not operational, according to former employees.

151.    On April 29, 2024, the Company issued its 2024 Proxy Statement, solicited by the Director Defendants, which sought shareholder approval for, *inter alia*: (i) the re-election of Defendants Grain, Griffin, and Jay to the Board; and (ii) executive compensation.

152.    The 2024 Proxy Statement contained the following:

**Code of Conduct**

63

As mentioned above, the Board of Directors has adopted the Code of Conduct, which is available on our website, that applies to all of our officers, directors and employees, including our principal executive officer and principal financial officer. The purpose of the Code of Conduct is to promote, among other things:

- honest and ethical conduct;

- maintenance of accurate financial records and adherence to applicable accounting rules and policies;

- compliance with applicable governmental laws, rules and regulations; and

- accountability for adherence to the Code of Conduct and the reporting of violations thereof.

### Risk Oversight

The Company's risk management is overseen by the Chief Executive Officer, who receives reports directly from employees and individuals who perform services for the Company. Material risks are identified and prioritized by management, and material risks are periodically discussed with the Board of Directors. The Board of Directors regularly reviews information regarding the Company's credit, liquidity and operations, including risks and contingencies associated with each area. In addition to the formal compliance program, the Board of Directors encourages management to promote a corporate culture that incorporates risk management into the Company's corporate strategy and day-to-day business operations.

153.    In discussing Risk Oversight, the 2024 Proxy Statement failed to disclose the risks arising from the fact that construction was not proceeding efficiently and that the issued timelines for the Altamira FLNG Project had no reasonable basis and were unrealistic which was known, or should have been known to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statement in the 2024 Proxy Statement regarding Risk Oversight was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

154.    Furthermore, the Director Defendants' statement regarding the Company's Code of Conduct was materially false and misleading because the Director Defendants were not adhering

64

to the Code of Conduct and were, in fact, acting in violation of the Code of Conduct.

155.    On the basis of the foregoing false and misleading statements, shareholders approved, among other things, the re-election of Defendants Grain, Griffin, and Jay to the Board, thereby enabling them to continue breaching their fiduciary duties to the Company and causing harm to the Company. Had the 2024 Proxy Statement not been false and misleading, then shareholders would not approved the re-election of Defendants Grain, Griffin, and Jay, meaning the Company would not have suffered harm from the continued breaches of fiduciary duty as alleged herein.

156.    On May 8, 2024, the Company reported its quarterly earnings for the first quarter of 2024, *i.e.*, 1Q24.  The Company issued a press release and hosted an investor conference call.

157.    New Fortress' press release titled *New Fortress Energy Announces First Quarter 2024 Results* stated:

> NEW YORK -- (BUSINESS WIRE) -- May 8, 2024 -- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") today reported its financial results for the first quarter of 2024.
>
> Summary Highlights
>
> ***
>
> Illustrative Adjusted EBITDA Goal of ~$2 billion in the full year 2024
>
> "This has been a tremendous quarter for the company with a number of significant milestones. We have completed the construction of our first FLNG unit and are currently commissioning the asset, with First LNG expected later this month and first full cargo expected in June. We commenced operations in Brazil at both of our LNG terminals and have 2.2 gigawatts of power under construction. Additionally, we completed the sale of the power plants that we developed for FEMA in Puerto Rico and concurrently won an 80 Tbtu island-wide gas contract, paving the way for significant expansion of our business in Puerto Rico. These milestones underscore our commitment to growth, sustainability, and long-term shareholder value," said Wes Edens, NFE chairman and chief executive.

158.    The above-referenced statements were materially false and/or misleading when

65

made because: (a) the Individual Defendants did not expect, and had no reasonable basis to expect, "First LNG" within the month followed by "first full cargo" in June 2024; and (b) the statements omitted the following known material non-public information necessary to make the statements not misleading under the circumstances under which they were made: (1) construction was still ongoing after recent and severe setbacks. As described by former employees, an explosion occurred on April 26, 2024 on the rig damaging the LNG refrigeration operations, necessitating extensive repairs and causing significant delays; (2) the Company had not secured service contracts reflecting its internal understanding that the FLNG unit was still months away from commercial operation; and (3) the FLNG unit's true status of completion negated any realistic chance of the Company meeting the production timelines provided in the above press release and, in turn, undermined any reasonable chance of meeting the Company's earnings targets. Consequently, in addition to misrepresenting that the FLNG unit was completed and ready (or nearly ready) for commercial operation, the above statements also created and concealed acute and material risks that the Altamira FLNG Project would not be completed on time and that the Company would be unable to meet (or come reasonably close to meeting) its earnings target for 2024.

159.    Defendants Edens and Guinta participated in the investor conference call on May 8, 2024. During the investor conference call, Defendants Edens and Guinta stated:

> **Defendant Edens**: …. Today, the liquefier is mechanically complete. We are in the final stages of commissioning it. We expect gas in a matter of the next several days, not months. We expect the first cargo in June. . .
>
> ***
>
> **Defendant Guinta**: Thanks, Andrew. Good morning, everybody. Let's flip to Page #19 and talk to the FLNG projects. On this slide, we've included a recent photo of FLNG 1 offshore Altamira, and the positive news is we are in the absolute final stages of commissioning. We've fully commissioned all safety systems, power and utilities equipment, the gas treatment modules, LNG pumps and the LNG transfer hoses, and we're working on the final system to be completed, which is the MR

66

compressor. I do want to take a moment and confirm that we did experience an incident with a pipe fracture inside of our cold box last Friday, April 26. This is an extremely unfortunate given that we are expecting First LNG a mere 72 hours later.

The pipe incident caused the box's insulation material, a nontoxic volcanic sand called perlite to be admitted [sic] all over the rigs. Thankfully, no significant injuries were sustained and as a result of our excellent team in the field as well as our preventative measures together ensured that no adjacent systems were damaged. While the incident looked like it was much more extensive than it actually was on account of the perlite dusting, the damage was isolated to one pipe and manifold within the box and is expected to be repaired by next weekend. This is why commissioning is so important and why we've invested in excellent partners that have been overwhelmingly supportive as we try to move through the balance of the commissioning work and produce LNG.

160.    Defendants Edens' and Guinta's statements identified above were materially false and/or misleading when made because: (a) the Company was not then in "the final stages" or the "absolute final stages" of commissioning; (b) the Individual Defendants understated both the magnitude of the explosion experienced within the cold box and the extent of repair required; and (c) Guinta did not expect, and had no reasonable basis to expect, the cold box to be "repaired by next weekend." The timeline for operations at the FLNG unit was still unknown in part due to the fact that construction and commissioning was still ongoing, which delayed the execution of service and repair contracts, according to former employees.

161.    On June 14, 2024, the Company issued a press titled, *NFE Announces First LNG in Days and First Cargo in July*. The press release stated:

NEW YORK -- (BUSINESS WIRE) -- Jun. 14, 2024 -- New Fortress Energy Inc. (Nasdaq: NFE) ("NFE" or the "Company") announces First LNG in the coming days and First Cargo in July.

NFE today updated the timing of its First LNG expectation for its first Fast LNG unit located offshore Altamira, Mexico. The Company has made tremendous progress on its path towards the start of liquefaction operations.

As of today, the work necessary to begin operations is complete and the Company has also completed the full remainder of pre-commissioning activities. The Company now expects to produce LNG in the next 10 days, and then expects to be

67

able to deliver its First Cargo in July.

162.    The above-referenced statements were materially false and/or misleading when made because: (a) "the work necessary to begin operations" was not then "complete." In particular, key components of the FLNG unit had not been commissioned yet, such as the heavy hydrocarbon removal unit, while other components were still malfunctioning and in need of repair, such as the scrubs column bottom pump; (b) the Company was not then prepared to produce LNG in the "coming days," as represented. According to former employees, executive management did not know when the FLNG unit would be operational and, consequently, was delaying the execution of service and repair contracts in June 2024.

163.    On July 23, 2024, the Company issued a press titled *New Fortress Energy Announces Closing of $700 Million Loan for Second FLNG Unit*.  The press release stated:

> NEW YORK -- (BUSINESS WIRE) -- Jul. 23, 2024 -- New Fortress Energy Inc. (NASDAQ: NFE) ("NFE" or the "Company") today announced that after successfully producing LNG at its first FLNG unit ("FLNG 1"), the Company has closed its previously announced $700 million loan for its second FLNG unit ("FLNG 2"). Now operational, FLNG 1 expects to deliver its first cargo in August and enter full production thereafter.

164.    The above-referenced statements were materially false and/or misleading when made because: (a) the Altamira FLNG Project was not then "operational"; and (b) the Individual Defendants did not then expect or have a reasonable basis to expect "first cargo" in August 2024. Contrary to these statements, commercial production was still months away given the true state of the Altamira FLNG Project by this time.  Executive management did not know when the FLNG unit would be operational and, consequently, had been delaying the execution of service and repair contracts as recently as June 2024.  Moreover, the "scrubs column bottom pump" had failed commissioning in early-July 2024 and commissioning of the heavy hydrocarbon removal unit did not occur until late-July 2024, according to former employees.

## THE TRUTH EMERGES

165.    On February 28, 2023, the Company reported its financial earnings for 4Q22 and, in pertinent part, lowered its full year guidance for 2023 while also delaying its target mechanical completion date for the Altamira FLNG Project, as described *supra*. On this partial disclosure or the materialization of the concealed risk thereof, the price of the Company's common stock fell from $38.74 per share on February 27, 2023, to $32.99 per share on February 28, 2023.

166.    Analysts reacted negatively in response to the announcement. For instance, on February 28, 2023, BTIG lowered its price target from $50 per share to $48 per share and noted that "while an earnings miss is never good, we believe the bigger drivers of the sell-off were 1) lower 2023 guidance, now at ~$2B, which was down 20% from $2.5B (we note consensus last night was $1.8B, BTIG $1.7B) and 2) lower expected production volumes from the FLNG #1 (though it's still expected to start in July, we are modeling a 4Q start), with FLNG #1 2023 production guidance at 29 TTBtu (down from 47 TTBtu last quarter)."

167.    On February 29, 2024, the Company reported its financial earnings for 4Q23 and guidance for 2024. The Company disclosed delays at the Altamira FLNG Project, as discussed supra. Analysts reported on this, thereby confirming its importance to the market. For instance, on February 29, 2024, J.P. Morgan issued a report titled *Strong 4Q23 Results & 2024 Guidance; Further Delays to First LNG at FLNG1*. The report continued, noting that "NFE's 4Q23 adjusted EBITDA was modestly above expectations . . . . However, the company slightly pushed back its first LNG target date to March 2024." Similarly, on February 29, 2024, Morningstar also focused on the delays at the Altamira FLNG Project, writing in pertinent part that the Company pushed back its timeline for the facility to March 2024 after originally targeting 2023. Analysts were focused on the Altamira FLNG Project delays in light of New Fortress' need to "boost volumes

and generate the cash needed to meet its maturing debt and new obligations . . . ."

168.    On this partial disclosure or the materialization of the concealed risk thereof, the Company's stock price fell from $35.15 per share to $34.43 per share on March 1, 2024, before falling further to $32.02 per share on March 4, 2024.

169.    Analysts reacted to this partial disclosure, thereby confirming its importance to the market. For instance, on February 29, 2024, Morningstar focused on the delays at the Altamira FLNG Project, writing in pertinent part that the Company pushed back its timeline for the facility to March 2024 after originally targeting 2023.

170.    On July 23, 2024, the Company announced it closed on new financing that was previously disclosed in February 2024. Importantly, the announcement noted that the financing agreement came after the Altamira FLNG Project had completed its first liquefaction days earlier and that New Fortress was now expecting to deliver its "first cargo" in August 2024. This marked yet another delay given that the Company had most recently stated first cargo would be delivered in July 2024 (after being initially targeted for 2023).

171.    On this partial disclosure or the materialization of the concealed risk thereof, the Company's stock price fell from $25.64 per share on July 22, 2024 to $21.85 per share on July 23, 2024 before falling further to $20.65 per share on July 24, 2024.

172.    Analysts and investors finally pieced together the true state of affairs at the Altamira FLNG Project after the Company reported its quarterly earnings for the second quarter of 2024, i.e., 2Q24. On August 9, 2024, the Company issued a press release announcing unexpectedly weak earnings and lowering their guidance for the second half of 2024. The press release stated:

> Our Adjusted EBITDA in the second quarter of $120 million was well below our expectation of $275 million. This was largely the result of delays in placing our

70

FLNG 1 project into service, which was originally expected to occur at the beginning of the second quarter. As detailed in our earnings presentation, the cost of this delay is approximately $150 million per quarter in lost operating margin, which represents the vast majority of the Adjusted EBITDA shortfall for the quarter.

173.    The press release further contained a quote from Defendant Edens, stating:

We have a large and expanding business, with a broad and robust portfolio and customers. While we are disappointed in the delay in placing FLNG 1 into service, it is now operational and we are very excited about the future of our business.

174.    A number of well-known analysts issued reports in response to the Company's quarterly announcements.  J.P. Morgan, for instance, issued a report on August 9, 2024 titled *2Q24 Every Bit as Bad as Expected; Guidance Sets Up a "Credibility Rerack"*.  The analyst report stated that "2Q24 was an abysmal quarter on EBITDA and free cash flow" in part because of "the delay on FLNG1. But management used the quarter as an opportunity to lay out what we view as appropriately conservative and transparent guidance (for perhaps the first time)."  The report explicitly discussed the Company's prior statements about the timeline for the Altamira FLNG Project, stating "After years of overly aggressive and opaque guidance and the ~7 month delay on FLNG1, the company appropriately re-racked guidance and added substantially more detail in the 2Q24 presentation."

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE

175.    As revealed by internal Company documents, the Individual Defendants were at all times made aware of the FLNG 1 project and its progression, as well as the Company's true financial condition and projections. Despite this, the Individual Defendants continued to closely review the above-referenced false and misleading statements, actively authorized the issuance of those false statements, and failed to correct those false statements either prior to or following publication.

71



177.



178.



179.

180.



181.

182.



183.



184.

185.





187.

188.    On February 23, 2024, the Audit Committee held a meeting in which Defendants Grain, Griffin, Wanner, and Guinta each attended. During this, the following was discussed:



189.



190.

191.





192.

193.



## SUBSEQUENT EVENTS AND REVELATIONS

**The Individual Defendants Admit the**
**FLNG 1 Project Drove the Company's Earnings**

194.    The Altamira FLNG Project played an integral role in the Company's operations and earnings and was therefore mission-critical to the Company's ongoing operations and success. It was of paramount importance and its successful construction, commissioning, and operation was essential for the Company to achieve the EBITDA targets it provided to investors at its FLNG Investor Day on November 2, 2022.

195.    In fact, when announcing the increased 2022 and 2023 earnings goals, the Company stated it was "raising its full year 2022 Illustrative Adjusted EBITDA Goal to ~$1.1 billion (from $1.0+ billion) and its full year 2023 Illustrative Adjusted EBITDA Goal to ~$2.5+ billion (from $1.5+ billion)." The Company further stated that "The increases in NFE's illustrative goals are due to portfolio optimization and higher operating margins in our core business lines, as

84

well as – most significantly – the expected on-schedule deployment of our first floating liquefaction unit ('FLNG 1') in the first half of 2023."

196.    On December 13, 2022, Defendant Edens admitted that even "a month or 2 or 3" delay at Altamira could materially hurt the Company.  During a conference call, Defendant Edens stated as follows in response to an analyst question:

> **BofA Securities**: Just as your -- it appears that this is a forward-looking number, which you've -- how do you -- how are you thinking about -- how should we think about how much of that is locked in? And how much margin of safety you've built into that forecast or that forecasted dividend that you're going to pay out?

> **Defendant Edens**: Yes, there's -- it's -- from my standpoint, it is not really forward-looking based on kind of the business flows and the transactions that we have in hand. So we feel like it is reflecting the reality of the business more so than projecting kind of some forward results. And we've been very clear about what we think the future holds. We have, obviously, a lot of tools at our disposal to make these numbers. And feel really good about it. I think that we do mitigate a substantial amount of our risk through a variety of different measures. There's the easiest way to lock in provinces to sell supply. We've done a lot of that. The second easiest way to do it is to hedge it. And obviously, there's a lot of factors you can take into consideration there, but we've done that as well. So there's variability. I'd say the most significant variability from my standpoint is in the second half of the year, not the first half of the year, and that just simply relates to when the FLNG turns on. And I think that for those of you that went down to our site visit in Corpus, I think that everyone is there hopefully understands it's merely a question of when, not if. And obviously, a month or 2 or 3 can make a difference.

197.    The importance of the Altamira FLNG Project was also heightened due to certain regulatory hurdles that existed at the time affecting the Company's domestic FLNG plans. FE5 (analyst from July 2022 to November 2023) explained that Fmr. President Joseph Biden's energy policies significantly slowed down the Company's FLNG plans with respect to its Louisiana-based unit.  The U.S. Department of Energy refused to grant export permits, which effectively halted progress on New Fortress' FLNG unit in Louisiana.  This caused New Fortress to shift its focus to the Altamira FLNG Project, which was not impacted by those policies because Altamira is in Mexico.

198.    According to FE5, Defendant Edens had connections within the U.S. Department of Energy that he was hoping to use to expedite approvals for domestic FLNG units. However, Edens' connections did not help as he had initially hoped, resulting in Defendant Edens shifting his attention entirely to the Altamira FLNG Project.

199.    The Altamira FLNG Project's importance to the Company's overall business strategy and earnings renders it implausible that the Individual Defendants would not know about the severe impediments reported and corroborated by the FEs identified in this Complaint or were unaware of facts that were inconsistent with the misrepresentations they repeatedly made to investors.

**Officer Defendants Tracked FLNG 1 Daily**

200.    FE11 (Vice President at New Fortress from June 2021 until June 2024) confirmed that Defendants Edens and Guinta were deeply concerned about the delays at the Altamira FLNG Project and the financial impact they would have on the Company's earnings. According to FE11, the FLNG unit and its delays were a top concern for both Defendants Edens and Guinta, who were both very "hands-on." FE11 could not see how Defendants Edens or Guinta could ever "claim ignorance."

201.    FE11's statement is corroborated by the fact that Defendants Edens and Guinta had daily calls concerning the progress of the Altamira FLNG Project. As Defendant Edens stated during New Fortress' 4Q22 investor conference call, "as Chris [Guinta] has talked about before, we have a daily call on this. And our teams are working very, very hard on this. . . . The first one up and running is a massive accomplishment for the company and something we look forward to. Not only is it the first step towards a vertical integration of the business, but it also is a real proof of concept of these stranded and offshore gas assets that not only for us, but for others, we think

86

are big opportunities to do something with . . ."

202.    According to FE2 (Gas Treatment Operator from January 2024 to December 2024), Defendant Edens was a member of a WhatsApp chat group (a popular application that allows users to send text, voice messages, video messages, etc.) where he demanded daily, and sometimes hourly, updates from supervisors on-site at the Altamira FLNG Project.  FE2 said that Defendant Edens frequently asked FE12 (Vice President of Commissioning and Startup) for updates and that Defendant Edens was heavily involved in the day-to-day operations of the project, often using the WhatsApp chat group to bypass traditional chains of command.  According to FE2, supervisors were required to provide updates every two to three hours, even during night shifts, so that Defendant Edens could monitor progress in real-time.  In addition to FE12, other members of the WhatsApp chat group included Marshall Charles (to whom FE2 reported), Thomas Quattrini (Operations Shift Supervisor), and Matthew Laverne (Operations Supervisor).  FE2 said that Defendant Edens' involvement was a source of pressure and frustration for the team because of his micromanagement over the Altamira FLNG Project.

203.    Defendant Edens also visited the Altamira FLNG Project in person.  In January 2024, FE8 (Telecommunications Lead from November 2023 until February 2024) attended a meeting with Defendant Edens at the Altamira FLNG Project in the helicopter lounge. Other attendees at the meeting included FE12.  The purpose of the meeting was to discuss allegations of misconduct among workers and staff on the rig.  On or around May 1, 2024, following the cold box explosion, Defendant Edens flew to the rig to get a first-hand look at the aftermath.

204.    FE12 confirmed that Defendant Edens was deeply involved in project oversight for the Altamira FLNG Project.  Starting in 2023, Defendant Edens participated in daily meetings with senior leadership, including Guinta, Andrew Couch (the Managing Director of the FLNG unit

construction), and representatives from Fluor (before they were terminated).  FE12 said that, in addition to these meetings, Defendant Edens frequently communicated via WhatsApp and direct calls, often on a daily basis.  FE12 stated further that Defendant Edens also visited the offshore unit four times after it was deployed.  Defendant Edens' first visit occurred at the beginning of 2024, followed by another trip in May 2024 immediately after the cold box explosion.  He returned twice more later in the year. FE12 provided regular project updates to Defendant Edens through WhatsApp and during the meetings described above.

205.    Defendant Edens and other members of senior management also received updates about the Altamira FLNG Project through formal channels of communication, including Andrew Couch who served as Managing Director of FLNG Operations.  Couch was the formal primary point of contact between offshore teams at the Altamira FLNG Project and New Fortress' executive leadership.  According to FE8 (Telecommunications Lead from November 2023 until February 2024), Couch was responsible for consolidating and delivering project updates to New Fortress' c-suite and other executives.  These updates necessarily included the project status reports collected using the project tracking programs at the Altamira FLNG Project, including Fluor Corporation's program MC Plus.

206.    Additional meetings with executive management occurred on Mondays, according to FE4 (financial analyst from November 2021 to February 2022). Attendees at these meetings included Justan Bristow (who managed New Fortress' financial modeling) as well as Defendants Edens and Guinta.  Other executives would also attend, such as the Company's head of operations. The meetings focused on the Company's financial projections and performance. Presentations concerning the Company's operations and finances would be used during the meetings and given to Defendants Edens and Guinta.

207.    In light of the foregoing, Defendant Edens possessed real-time knowledge of the Altamira FLNG Project's construction.  Thus, when making statements that misrepresented the status of the Altamira FLNG Project, Defendant Edens did so intentionally or (at minimum) with deliberate recklessness as to whether he was misleading the market.

**Individual Defendants Admit FLNG 1 Was Not Operational**

208.    Defendant Guinta additionally knew the status of the Altamira FLNG Project's completion throughout the relevant time period from reports provided to him. Along with other members of the Company's executive leadership, Defendant Guinta received reports from Andrew Couch (Managing Director of FLNG Operations), according to FE8 (Telecommunications Lead from November 2023 until February 2024).  Moreover, as described by FE11 (Vice President at New Fortress from June 2021 until June 2024), Defendant Guinta instructed FE11 in January 2024 and onward to defer signing service agreements repeatedly because the Altamira FLNG Project was not completed.  This continued through June 2024, according to FE11.

209.    Defendant Guinta, in particular, was recognized publicly as the executive at the Company responsible for providing updates about the Altamira FLNG Project.  Quarter to quarter, Guinta was the executive responsible for speaking about the project on every investor conference call.  Defendant Guinta's consistent role as the provider of information concerning the project underscores his familiarity with the actual adverse, non-public information at issue in this action.

210.    Defendant Guinta's receipt of reports from Couch, interaction with FE11, and repeated responsibility for providing project updates to the public demonstrate his knowledge of the true status of the Altamira FLNG Project. Consequently, when making statements that misrepresented the status of the Altamira FLNG Project, Guinta did so intentionally or (at minimum) with deliberate recklessness as to whether he was misleading investors.

## The Individual Defendants Unjustly Enrich Themselves

211.    With the announcement of the Altamira FLNG Project in July 2022, analyst and investor interest started to build. Edens effectively turbo-boosted the hype around the project when he announced in November 2022 at the FLNG Investor Day that the Company was raising its 2023 earnings targets from $1.5 billion to "$2.5 billion plus." On the heels of these announcements and while the Company's stock price was near all-time highs, Defendant Edens shocked investors with a massive change to the Company's dividend policy.

212.    On December 12, 2022, the Company announced that its Board approved a radically different dividend policy, which previously paid approximately $0.10 per share. Under the new policy: "NFE is targeting an annual cash dividend equal to approximately 40% of its annual Adjusted EBITDA. In connection with adopting this dividend policy, the Board today declared a dividend of $3.00 per share…" The press release also contained a quote from Defendant Edens, stating that "Our business is now generating significant, stable, and growing cash, which we believe affords us the ability to both retain capital necessary to grow and return excess capital to shareholders in the form of meaningful dividends."

213.    In January 2023, the Company issued the $3.00/share dividend, which amounted to payment of approximately $626 million. This was the one and only time the Company paid the $3.00/share dividend. Dividends before and after this dividend were at the customary $0.10/share quarterly payment.

214.    At the time of the January 2023 dividend, Defendant Edens owned and/or beneficially controlled over 72.6 million shares of stock. This allowed him to control the Board in terms of approving the dividend as well as reap massive proceeds from the dividend payment. Given his ownership of stock, the January 2023 dividend resulted in Defendant Edens receiving a

90

cash payment of approximately $217 million, personally pocketing about 35% of the overall dividend payment made by New Fortress.

215.    Similarly, Defendant Nardone, co-founder, received approximately $78.59 million, personally pocketing about 12.11% of the overall dividend payment made by the Company. Likewise, each of the Individual Defendants personally profited from this scheme by receiving 2900% more than they would have done had the dividend policy not changed.

216.    The Company was able to pay this dividend and, in turn, Defendant Edens was able to receive this dividend in part due to the investor interest around the Altamira FLNG Project created by Edens in the first place. But for Defendant Edens' false and materially misleading statements about the Altamira FLNG Project and the Company's new earnings targets, the Company's value would have been materially lower. The Company's value at this point in time was critical to Defendant Edens' scheme because the Company ultimately financed the $3.00/share dividend instead of paying it from realized earnings.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

217.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

218.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

219.    The Individual Defendants accomplished their conspiracy, common enterprise,

and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

220.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of the Company, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

221.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

222.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of New Fortress and at all times acted within the course and scope of such agency.

## DAMAGE TO THE COMPANY

### Securities Class Action

223.    On September 17, 2024, a securities class action complaint was filed in the United States District Court for the Southern District of New York against the Company the Officer Defendants. On February 18, 2025, an amended complaint was filed. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

92

Act"), and SEC Rule 10b-5, in the case captioned: *In re New Fortress Energy, Inc. Secs. Litig.*, Case No. 1:24-cv-07032-JGK (S.D.N.Y.) (the "Securities Class Action").

224.    As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

225.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

226.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

227.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Dividend Increase**

93

228.    On December 12, 2022, the Company announced that its Board approved a radically different dividend policy, which previously paid approximately $0.10 per share. Under the new policy: "NFE is targeting an annual cash dividend equal to approximately 40% of its annual Adjusted EBITDA. In connection with adopting this dividend policy, the Board today declared a dividend of $3.00 per share…" The press release also contained a quote from Defendant Edens, stating that "Our business is now generating significant, stable, and growing cash, which we believe affords us the ability to both retain capital necessary to grow and return excess capital to shareholders in the form of meaningful dividends."

229.    In January 2023, the Company issued $3.00/share dividend, which amounted to payment of approximately $626 million. This was the one and only time the Company paid the $3.00/share dividend. Dividends before and after this dividend were at the customary $0.10/share quarterly payment. Had the policy not been changed, then the dividend for January 2023 would have been approximately $21.6 million.

230.    According to the Company's quarterly report for the first quarter of 2023 (*i.e.*, 1Q23), the Company borrowed $700 million under its expanded revolving credit facility during the quarter. While the Company said the borrowings were used primarily to fund the development of the Altamira FLNG Project, the proceeds also allowed the Company to pay a total of $649 million in dividends during the quarter (which included the $3.00/share dividend).

231.    The Company did not initially have access to these funds under its credit facility but instead had to amend it in 2022 and 2023 to increase borrowing capacity. According to the Company's quarterly report, the Company amended the revolving facility twice in 2022 and once in February 2023 in order to borrow the money needed for the dividend. Thus, although the Company represented that its current business operations could support the dividend, it was instead

financed. Had Defendant Edens relied on the Altamira FLNG Project to finance the dividend, it would not have been possible.

232.    As such, the Company has been harmed by the Individual Defendants authorizing a change to the dividend policy, thereby causing the Company to pay out over $600 million more than it should have done, which the Company could not afford.

233.    In addition, the Company has been, and will continue to be, subjected to harm through the repayment of the significant loans taken to finance the Company's dividend increase at exorbitant interest rates, including up to 12%.[2] As a result of this long-term debt, which includes the Company's $2.7 billion 12% senior secured notes, the Company and its loans were recently downgraded by Fitch Ratings.[3]

**Additional Damage to the Company**

234.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

235.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

236.    The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the

---

[2]    *See* New Fortress Energy, Inc., Form 8-K, SEC (Nov. 21, 2024), https://ir.newfortressenergy.com/static-files/c799ec00-2141-460d-89a0-ab88dea05cb9.

[3]    Robert Slavin, *PREPA generating company lowered to CCC by Fitch*, Fidelity (Jun. 6, 2025), https://fixedincome.fidelity.com/ftgw/fi/FINewsArticle?id=202506061442SM____BNDBU YER_00000197-4664-dbf4-a39f-de7436e10001_110.1

Company's share price going forward.

## CORPORATE GOVERNANCE

237.    At all relevant times, the Company had in place extensive corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.

238.    Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

### Code of Conduct

239.    At all relevant times hereto, the Company had in place is Code of Business Conduct ("Code of Conduct") which applies to "all NFE officers, directors, employees." The Code of Conduct begins by stating that "Your responsibilities" are to: "Act with Integrity," "Follow the Code," "Adhere to applicable laws, regulations, Company policies and procedures," "Ask questions," and "Share concerns."

240.    In a section entitled "We Speak Responsibly," the Code of Conduct states:

**Our commitment**

We are committed to protecting the NFE reputation and brand.  We use good judgement in every business communication whether it is verbal, written, or digital.

**Your responsibilities**

• Do not respond to inquiries from the media, investors, analysts, or others unless authorized to do so.

• Be professional in all communications.

• Be responsible when using social media.

241.    In a section entitled "We maintain accurate financial records," the Code of Conduct states:

**Our commitment**

We are committed to providing books and records that reflect an accurate picture of NFE's financial performance. As a publicly traded company, we adhere to all applicable accounting rules and policies, laws and regulations, as well as Company policies and procedures. Proper financial controls are also in place to protect our assets.

**Your responsibilities**

• Be accurate, complete, and timely in recording business transactions.

• Obtain necessary approvals prior to entering into a financial transaction.

• Maintain supporting documentation for all transactions.

• Cooperate fully with internal and external audits.

• Report concerns. If you believe there are any suspected errors or have concerns about our financial records or internal controls, contact our Chief Accounting Officer, Chief Financial Officer, or Compliance. If you have concerns about questionable accounting or audit matters (e.g., concerns that may involve deficiencies in internal controls, misappropriation or fraud), call the Employee Accounting and Auditing Complaints Hotline found in NFE's Accounting and Auditing Whistleblower Policy.

242.    In a section entitled "We do not trade on inside information," the Code of Conduct states:

**Our commitment**

We do not buy or sell stock (including NFE stock) - or tip others that do so - based on material, non-public (inside) information. Material information includes information that, if known by the public, would be considered important in a decision to purchase or sell stock (e.g., projections of future earnings or losses, pricing proposals, unpublished information about a merger, acquisition, or divestiture, etc.).

97

**Your responsibilities**

• No insider trading or tipping.

• Read, understand, and follow NFE's Insider Trading Compliance Policy.

• Contact Legal or Compliance if you have any questions or concerns.

**Audit Committee Charter**

243.    At all relevant times hereto, the Company had in effect its Audit Committee Charter which sets forth the additional duties and responsibilities of the Audit Committee. The Audit Committee Charter states that the Audit Committee's purpose is "to oversee the accounting and financial reporting processes of the Company and its subsidiaries and the audits of the financial statements of the Company and to perform such further functions as may be consistent with this Charter or assigned by applicable law, the Company's By-Laws, as amended from time to time, or the Board."

244.    The Audit Committee Charter sets forth the following additional duties and responsibilities of the Audit Committee, in relevant part:

> In carrying out its duties and responsibilities, the Committee's policies and procedures should remain flexible, so that it may be in a position to best address, react or respond to changing circumstances or conditions. The following duties and responsibilities are within the authority of the Committee and the Committee shall perform such duties consistent with and subject to applicable law and rules and regulations promulgated by the SEC, Nasdaq or any other applicable regulatory authority:
>
> Review with management, the Company's independent auditors and, if appropriate, the Company's internal auditors, the following:
>
>> the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and any major issues related thereto.
>>
>> critical audit matters arising from the current period audit.

critical accounting policies and such other accounting policies of the Company as are deemed appropriate for review by the Committee prior to any interim or year-end filings with the SEC or other regulatory body, including any financial reporting issues which could have a material impact on the Company's financial statements.

major issues regarding accounting principles and financial statements presentations, including (A) any significant changes in the Company's selection or application of accounting principles and (B) any analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the ramifications and effects of alternative generally accepted accounting principles methods on the Company's financial statements.

alternative treatments of financial information that have been discussed by the independent auditors and management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the auditors.

other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences.

the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

Review with management and independent auditors, periodically, the following:

all significant deficiencies in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial data, including any material weaknesses in internal controls identified by the Company's independent auditors.

any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

any significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

Confirm that the Company's interim financial statements included in Quarterly Reports on Form 10-Q have been reviewed by the Company's independent auditors.

99

Once required pursuant to the applicable rules and regulations of the SEC, review:

> the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function through inquiry and discussions with the Company's independent auditors, management of the Company and the Company's internal auditors.

> and the yearly report prepared by management, and attested to by the Company's independent auditors, assessing the effectiveness of the Company's internal control structure and procedures for financial reporting and stating management's responsibility to establish and maintain such structure and procedures, prior to its inclusion in the Company's Annual Report on Form 10-K.

Review with management the progress and results of internal audit projects, and, when deemed necessary or appropriate by the Committee, direct the Chief Executive Officer to assign additional internal audit projects to the Company's internal auditors.

Review the type and presentation of information to be included in the Company's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as any financial information and earnings guidance provided by the Company to analysts (which review may be done generally (e.g., discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Company may provide earnings guidance).

Review with management the Company's administrative, operational and accounting internal controls, including any special audit steps adopted in light of the discovery of material control deficiencies, and evaluate whether the Company is operating in accordance with its prescribed policies, procedures and codes of conduct.

Review the Company's program to monitor compliance with the Company's Code of Conduct, and meet periodically with the Company's Compliance Officer or other appropriate person to discuss compliance with the Code of Conduct.

Report regularly to the Board on its activities, as appropriate. In connection therewith, the Committee should review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the

Company's internal auditors.

## FIDUCIARY DUTIES OF THE DIRECTOR DEFENDANTS

245.    As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

246.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

247.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

248.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

249.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

250.    Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

251.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

252.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

253.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

254.    Plaintiff is a current owner of the Company's common stock and has continuously

103

been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

255.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

256.    The Company Board is currently comprised of eight (8) members – Defendants Edens, Nardone, Catterall, Grain, Griffin, Jay, Wanner, and Non-Party Charles M. Sledge ("Sledge") (collectively, the "Current Directors"). Thus, Plaintiff is required to show that a majority of the Current Directors, *i.e.*, four (4), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.[4]

257.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

258.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

---

[4]    The Company admits in its 2025 Proxy Statement that two (2) directors – Defendants Edens and Nardone – lack independence. Thus, Plaintiff is required to show that just two (2) more Current Directors lack independence.

259.    The Current Directors (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

260.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

261.    As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

262.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

263.    Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and

made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

264.    As internal Company documents reveal, each of the Director Defendants ███████



265.    Additionally, each of the Current Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

266.    Despite having knowledge of the history of the misconduct and mismanagement, the Current Directors have failed to seek recovery for New Fortress for any of the misconduct alleged herein.

267.    Furthermore, according to the Company's 2025 Proxy Statement, the Company is a controlled company, meaning that, among other things, it need not maintain a majority independent Board. This also means demand is excused because the Current Directors are each beholden to and controlled by Defendants Edens and Nardone, the primary interested wrongdoers who were, and still remain, controlling shareholders of the Company. As such, Defendants Edens and Nardone control the continued nomination of the Current Directors to the Board. In light of this control, the Current Directors cannot impartially consider a demand against Defendants Edens

and Nardone, the interested, primary wrongdoers, as they are dependent on them for their continued directorship with the Company and the concomitant compensation. Thus, the Current Directors are unable to evaluate a demand with disinterest or independence given Defendants Edens' and Nardone's control over them

268.    The Director Defendants also each breached their fiduciary duties to the Company by approving a radically different dividend policy. As a result of this change, New Fortress issued a $3.00/share dividend, which amounted to payment of approximately $626 million. Had the policy not been changed, the dividend payment would have actually been approximately $21.6 million. New Fortress borrowed $700 million under its expanded revolving credit facility during the quarter. While New Fortress said the borrowings were used primarily to fund the development of the Altamira FLNG Project, the proceeds also allowed New Fortress to pay a total of $649 million in dividends during the quarter (which included the $3.00/share dividend). Thus, although Defendant Edens represented that New Fortress' current business operations could support the dividend, it was instead financed. As such, the Director Defendants breached their fiduciary duties by causing the Company to pay out a higher dividend than it could afford, subjecting the Company to having to finance the dividend.

269.    Furthermore, each of the Director Defendants received a material personal benefit from their decision to approve the change to the dividend policy. Indeed, each of the Director Defendants personally held shares of the Company's stock. As a result of the increased dividend in January 2023, the Director Defendants each received dividends of more than 2900% what they would have done had they not approved the change in policy. As such, none of the Director Defendants can be considered independent or disinterested.

**THE DIRECTOR DEFENDANTS ARE
NOT INDEPENDENT OR DISINTERESTED**

**Defendant Edens**

270.    Defendant Edens is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Edens cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

271.    As CEO, Defendant Edens also fails the Nasdaq bright-line independence test as set forth in Nasdaq Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2024 Proxy Statement. As such, Defendant Edens could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Edens is therefore futile.

272.    Defendant Edens also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Edens is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

273.    In addition, Defendant Edens receives lucrative compensation in connection with his employment with the Company. Defendant Edens is not independent from Defendants Grain, Griffin, and Jay who serve on the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Edens. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Edens is neither independent nor could he consider a demand adverse to the

other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

274.    Furthermore, Defendant Edens used the Company's inflated share price and the false and misleading statements to unjustly enrich himself. Indeed, Defendant Edens changed the Company's dividend policy so that in January 2023, New Fortress issued a $3/share dividend. As a result, Defendant Edens receiving a cash payment of approximately $217 million, personally pocketing about 35% of the overall dividend payment made by New Fortress.

275.    Because of Defendant Edens's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Edens is unable to comply with his fiduciary duties and prosecute this action. Defendant Edens is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Nardone**

276.    Defendant Nardone is a co-founder of the Company and, as a result, lacks the requisite independence from the Individual Defendants who have helped build his Company. As a result of his clear interest and lack of independence, Defendant Nardone could not reasonably nor objectively consider a demand to sue.

277.    Furthermore, Defendant Nardone used the Company's inflated share price and the false and misleading statements to unjustly enrich himself. Indeed, as a result of his co-founder, Defendant Edens, changing the Company's dividend policy, Defendant Nardone received a cash payment of approximately $78.59 million, personally pocketing about 12.11% of the overall dividend payment made by New Fortress.

**Defendant Grain, Griffin, and Wanner**

278.    Defendants Grain, Griffin, and Wanner either serve, or served, as members of the Audit Committee. Pursuant to the Audit Committee Charter, Defendants Grain, Griffin, and Wanner were specifically charged with the responsibility of assisting the Board in fulfilling its oversight responsibilities related to internal controls over financial reporting and public disclosure requirements.

279.    At all relevant times, however, Defendants Grain, Griffin, and Wanner breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations as alleged above.    Therefore, Defendants Grain, Griffin, and Wanner cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

280.    Indeed, internal Company documents reveal that Defendants Grain, Griffin, and Wanner ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████

## Additional Reasons Demand is Futile

281.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

282.    The Company, at all material times, had its Code of Conduct and related corporate

governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Current Directors failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

283.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

284.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

285.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

286.    Publicly traded companies, such as New Fortress, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Current Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

287.    Accordingly, each of the Current Directors, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Current Directors is futile and, thus, excused.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### (Against the Individual Defendants for Breach of Fiduciary Duty)

288.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

289.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

290.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

112

291. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent that the Company possessed reliable information pertaining to its projected revenue outlook and anticipated growth while also minimizing risk regarding the New Fortress' plan to have its Fast LNG projects fully operational and increase business growth globally. In reality, New Fortress' Fast LNG projects failed to meet the Company's publicly stated progress, specifically that its FLNG 1 would be in service by March 2024. Even following the announcement that these delays were costing the Company upwards of $150 million per quarter, the officers and directors were still touting the speed at which New Fortress was building facilities. The officers and directors misled investors by providing the public with materially flawed statements of confidence and growth projections, which did not account for these variables. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

292. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

293. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

**(Against the Individual Defendants for Gross Mismanagement)**

294.    Plaintiff incorporates by reference and re-allege each allegation contained above, as though fully set forth herein.

295.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

296.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

297.    Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against the Individual Defendants for Waste of Corporate Assets)

298.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

299.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going.  It resulted in continuous, connected, and ongoing harm to the Company.

300.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Officer

114

Defendants' unlawful actions; and (iv) causing and/or permitting the Company to repurchase its own common stock at artificially inflated prices.

301.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

## FOURTH CAUSE OF ACTION

### (Against the Individual Defendants for Unjust Enrichment)

302.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

303.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

304.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

305.    Plaintiff, as a shareholder and representative of the Company, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FIFTH CAUSE OF ACTION

### (Against the Individual Defendants for Aiding and Abetting)

306.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

307.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

308.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

309.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

310.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

311.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

312.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SIXTH CAUSE OF ACTION

**(Against the Director Defendants for Violations of
Section 14(a) of the Securities Exchange Act 1934)**

313.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

314.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

315.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

316.    The Director Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

317.    The Director Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2023 and 2024 Proxy Statements filed with the SEC.

318.    The Proxy Statements were used to solicit shareholder votes in connection with the re-election of certain Director Defendants to the Board, among other things.

319.    In discussing Risk Oversight, the Proxy Statements failed to disclose the risks

117

arising from the fact that construction was not proceeding efficiently and that the issued timelines for the Altamira FLNG Project had no reasonable basis and were unrealistic which was known, or should have been known to the Director Defendants in the exercise of prudent business judgment. As such, the foregoing statement in the Proxy Statements regarding Risk Oversight was a half-truth, meaning that the Director Defendants were required to (yet failed to) include all additional information necessary to make the statement not misleading. *See* 17 C.F.R. § 240.12b-20.

320.    Furthermore, the Director Defendants' statement regarding the Company's Code of Conduct was materially false and misleading because the Director Defendants were not adhering to the Code of Conduct and were, in fact, acting in violation of the Code of Conduct.

321.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

322.    The materially false and misleading statements contained in the Proxy Statements misleadingly induced shareholders to vote in favor of the election of certain Director Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties and harm New Fortress. Had the Proxy Statements not been false and misleading, then shareholders would not approved the re-election of certain Director Defendants, meaning the Company would not have suffered harm from the continued breaches of fiduciary duty as alleged herein.

323.    The Company was damaged as a direct and proximate result of the Director Defendants' material misrepresentations and omissions in the Proxy Statements.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law,

118

and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and aiding and abetting;

C.    Awarding, against all Director Defendants and in favor of the Company, the damages sustained by the Company as a result of the Director Defendants' violation of Section 14(a) of the Exchange Act;

D.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 11, 2025

GAINEY McKENNA & EGLESTON

Thomas J. McKenna
Gregory M. Egleston
Christopher M. Brain
260 Madison Ave., 22nd Floor
New York, NY 10016
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com

119

Email: gegleston@gme-law.com
Email: cbrain@gme-law.com

*Attorneys for Plaintiff*